MARGARET WILLIAMS ET AL. *v.* DAVID W.
ZIMMERMAN ET AL.

[No. 28, April Term, 1937.]

*Decided May 26th, 1937.*

564

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Thurgood Marshall* and *Leon A. Ransom,* with whom were *Charles H. Houston* and *Edward P. Lovett* on the brief, for the appellants.

*William L. Marbury, Jr.,* and *William L. Rawls,* with whom was *Cornelius V. Roe,* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

A negro child and her father, a resident and taxpayer of Baltimore County, appeal from a dismissal of their petition for the writ of mandamus to compel the school officials to admit the child to the Catonsville High School, a public school maintained in the county for white children only. Admission to that school, under any conditions, was refused because of the child's race and color. The county makes provision for high school education of colored children in Baltimore City, and it is answered that this child would have been given equal facilities for her education there if she had been qualified to avail herself of them, but that she was not qualified. In reply, it is contended for the petitioners that the child had all the qualification that the officials might require, that she was held unqualified upon a test unauthorized by law and not provided for children of both races equally; and, further, if she is found by the court to have been qualified for high school education, that she should be admitted to the Catonsville school because of its convenience,

because the law of the state does not authorize a separation of the races such as the officials are making, because the petitioners have a legal and constitutional right to the educational facilities within the county, and because, even if a provision of access to like education in the city might afford them all their rights, the provision as arranged and as administered does not afford them.

The county and the city are separate governmental units, and the county territory extends around that of the city for a distance, measuring through the center of it, of about thirty miles. The number of white children in the county is about ten times that of the negro children, and the great majority of the latter live in the thickly populated centers near the city, the remainder of the county being sparsely settled by them. Elementary teaching through seven grades is provided by the county school authorities for children of both races; four years of high school training within the county is provided for the whites only. The difference in number and distribution of the colored children render different arrangements for them inevitable if they are to be educated separately. Many of the colored elementary schools are so small that each is conducted by one teacher, teaching all grades and all subjects. Other colored elementary schools, including that attended by the child Margaret Williams, have larger staffs, with principals. It is testified that high schools cannot be conducted as efficiently for small numbers of pupils as for the larger groups, and that this leads to a preference for an arrangement for high school education of colored children of the county in the nearby city schools. Negro children desiring to take an eighth grade and high school course are therefore sent to the city schools upon payment of their tuition by the county. The city schools have eight grades in the elementary department, and four in the high school, twelve in all from the beginning of a child's schooling until graduation from the high school, and therefore one more than the county schools provide, but the eighth grade for county colored children is provided

in the city high schools. The county pays tuition for four years' additional teaching in the city.

Joshua Williams, with the child, Margaret, lives in the county close to the southwest boundary of the city, and about equally distant from Catonsville, in the county, and the nearest colored high school in the city. The city school could probably be reached more easily by public conveyance. The child finished the seventh grade in the county elementary school near her home in June, 1934, when she was thirteen years old, and, upon passing an examination given at her school, received from the principal a card certifying that she was "promoted to the eighth grade," and was recommended as a "very good student"; and she was officially listed as a graduate of the primary school. She took another examination given by county officials at Catonsville to test her qualifications for sending her to the city high school, but her marks were below the requirements, totaling 38¾ out of a possible 100, with 60 as the minimum for passing, and the county superintendent of schools recommended that she repeat the seventh grade in the primary school. She nevertheless went to the city high school and was admitted on presentation of the card from her principal, without examination by the city officials, the city schools requiring none. But her tuition not being paid either by her parents or by the county, she returned a month later to repeat the seventh grade. Again, at the end of another year, given a card marked, "promoted to the eighth grade," and included in the list of graduates, she again took the examination at Catonsville preliminary to being sent to the city high school, and her marks totaled 244 out of a required minimum of 250 and a possible 390. The minimum required had been lowered to suit colored children, who commonly did not attain the same results from their elementary teaching. It was in this situation that application for admission to the Catonsville school was made and refused.

The question whether the child had all the qualification that was lawfully required for high school educa-

tion is, of course, a foremost one, for, if she was not duly qualified to avail herself of any provision made for it by the county, her admission to any could not be compelled. It is evident that her principal in the county and her teachers in the city were satisfied of her ability to take the course. The meaning of her principal's certificates that the child was promoted to the eighth grade is clear, although the words were not exactly those prescribed for certificates, but it is denied that the principal had any authority to decide upon a child's admission to the higher course. For this, the respondents contend, the county authorities regularly, and lawfully, require children, both white and colored, to pass the test of the general, uniform examinations. This requirement by the county, the petitioners regard as a device for keeping down the number of colored children going to the city schools, and the expense to the county. They deny that it is given to both races alike, and assert that it is given to the colored children under conditions that deny equal opportunity to them.

It should be observed that the appropriate remedy for exaction of a test not authorized to be given to the colored children at all would seem to be, not admission to the school for whites, but payment of tuition in the city colored schools without the examination requirement. And the remedy for refusal to admit the child after her failure of a test which is authorized by law but defective would seem to be, not admission without a test, but a better test to determine whether she is qualified. For error of the authorities in either respect correction would not be by the remedy sought now, admission to the white children's school. Separation of the races is normal treatment in this state. Code, art. 77, secs. 114, 200 to 203, 211 and 256. And, given the settled policy of separation, the petitioners' primary right is to separate facilities substantially equal to those provided for white children. Admission to the white school could be required only upon a showing that the equality of treatment is not obtainable separately. *University of Maryland v.*

*Murray,* 169 Md. 478, 182 A. 590. And see 45 Yale Law Journal, 1296.

But the court finds a predominance of the proof leading to the conclusion that for a number of years the same carefully prepared examinations have been given to both white and colored children as prerequisites to admission to the high schools. There are some differences in administration. While white children are examined at the elementary schools familiar to them, the colored are gathered in central places at a distance from home for many, and strange to them. There is testimony that the white children, too, would be gathered in central places except for their too great numbers. The elementary school work of the white children is considered in preparing examinations and determining the children's fitness, while the school work of the colored children is unknown to the examination officials. It would seem possible, however, that these minor differences may arise from differences in the number and attainments of the children of the two races, and in the efficiency of the schools for the one and the other, and of their teachers. The rating of the colored children on the examinations has, as stated, been according to reduced standards, and the evidence would not support a finding that they suffer a disadvantage in the requirement. The officials seem to the court to have been endeavoring to treat both races fairly and equally, to the best of their ability, and the inequalities pointed out seem insufficient to show unconstitutional discrimination against colored children in the examinations. Possibly there might be, under some circumstances, inequalities encountered in dealing with the two races separately that would render the maintenance of the separation inconsistent with the constitutional requirement of equal protection of the laws, but the allowance of separate treatment at all involves allowance of some incidental differences, and some inequalities, in meeting practical problems presented. And it is the opinion of the court that the differences here amount to no more. Inequalities in the separate elementary school

teaching are complained of as having an effect to deny the colored children equal opportunities to qualify for the examinations, and thus equal access to the high school course, but this could not be remedied by admitting to a high school a child who is not fitted for it. The remedy would have to be one reaching farther back.

The only ground for questioning the authority of the officials to exact the test of the examinations before sending a child to the city schools is that of instructions given in a "Manual of Standards for Maryland County Schools," issued by the State Department of Education, of which the State Board of Education is the head (Code, art. 77, sec. 2), in 1927. It declared that the test for entrance in a high school "is usually based on the character of the pupil's previous achievements, as shown in his daily work, tests, and formal examinations, these factors being taken as a whole," and that "The possession of an elementary school certificate signifying the successful completion by the pupil of the course of study prescribed for the elementary school is sufficient to entitle the pupil to enter an approved high school without examination." This manual had not been modified at the time of Margaret Williams' exclusion from the high school, and it can cause no surprise that it aroused suspicion of irregularity and partiality in excluding a child with a certificate of fitness from her school principal, because she failed in an examination. But it appears clearly enough that this instruction was not followed, but, so far as it might ever have been binding, was superseded by custom, and that the examination was a test systematically given, and given to all alike. The State Superintendent of Schools testified that the instruction in the manual was intended to be provisional only, and not binding on the local board of education, and that the tests were regularly prepared with great care, after study and inquiry, and comparison with the tests elsewhere out of the state, and this was done by experts in the State Department of Education, apparently with the full knowledge of the State Board of Education, which has

power to determine the educational policies of the State. Code, art. 77, sec. 11. This development cannot now be held unlawful because of variance with the previous manual to which it did not conform.

Allowing all possible force to the contention that colored children were not accorded equal treatment in the examinations, this court is of opinion that consideration of the evidence now produced discloses differences of only a minor importance, as stated, and that these are not such as would justify issuance of the writ of mandamus. And, as this conclusion disposes of the appeal, the consideration of the grounds of complaint need go no further.

*Order affirmed, with costs.*