## FRANK H. DURKEE, ET AL., BOARD OF PARK COMMISSIONERS *v.* D. ARNETT MURPHY
### (Three Cases)

[Nos. 54-56, October Term, 1942.]

*Decided December 8, 1942.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, MARBURY, and GRASON, JJ.

*Wilson K. Barnes, Deputy City Solicitor,* and *J. Gilbert Prendergast,* with whom was *F. Murray Benson, City Solicitor of Baltimore,* on the brief, for the appellants in all three cases.

*Jesse Slingluff, Jr.,* on the brief for Maryland Committee of the American Civil Liberties Union.

*Dallas F. Nicholas* and *Robert P. McGuinn,* with whom were *Nicholas & Gosnell* and *Charles H. Houston* on the brief, for the appellee in all three cases.

BOND, C. J., delivered the opinion of the Court.

The case raises a question of the legality and constitutionality of a segregation of Negro golf players on one

of the four courses maintained by Baltimore City in its public parks. A petitioner for the writ of mandamus to remove the restriction and admit him to the other courses, now appellee, is a Negro citizen. Upon the verdict of a jury sworn in the case, under the Code, 1939, Article 60, Section 7, the writ was ordered issued as prayed and the respondents have appealed.

Since the year 1934 on the one course referred to, that in Carroll Park, colored players have been so restricted except for a short time in the year 1942. For the first two years they alternated with white players at Carroll Park in the exclusive use of certain days of the month, and in May, 1936, they were given the exclusive use of that course at all times. On May 6, 1942, the Board of Park Commissioners in charge ordered all restrictions removed, and admitted white and colored players indiscriminately to all courses. The action is alleged in the petition to have caused an outcry by white players and their sympathizers, and on June 9, 1942, it was recalled; and the Carroll Park course was again assigned exclusively to colored players, and they were excluded from the other three courses. Thereupon the petitioner presented himself at one of the others, the Mt. Pleasant course, to buy a ticket to play there, and was refused admission in accordance with the Park Board's order.

On the 18th day of June he filed his petition for the writ, complaining that the Carroll Park course was an inferior one, that the Park Board was not authorized by law so to segregate the players of his race, and if its act was authorized it amounted to a deprivation of equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States because it excluded him from better courses solely because of his color.

The Carroll Park course, one of nine holes, covers a smaller acreage than the other courses, has shorter fairways, has sand greens which are not so well constructed as those on well-known courses elsewhere, has metal discs marking the holes rather than flags, has no accom-

modation for washing balls, and has no golf professional present. There was evidence on behalf of the City, however, that professionals are not employed by it anywhere, and are present on other city courses, where there are more players, only of their own initiative, to profit by fees that players are willing to pay for their services. The club house at Carroll Park is not a subject of any complaint. The other city courses are of eighteen holes each, with turf greens, and longer fairways. They have two alternating tees for each hole, whereas the Carroll Park course has one. It was testified for the City, further, that of the rounds played on the four courses 90 per cent. are by white players, 10 by Negro players, and that if the Negroes are to be taken as playing two rounds on the nine-hole course, they number about 5 per cent. of all players; and the longer courses were provided with a view to accommodating the greater number of players.

It is argued on behalf of the City that golf is only one form of recreation of many provided for the enjoyment and benefit of the citizens in one park and another, and that substantially equal opportunities for recreation in compliance with the constitutional requirements may be furnished the one race in other forms, so that a golf course need not be provided in Carroll Park at all if other facilities for recreation there are adequate to the needs and requirements of Negroes who use the park; and the court is impressed with the argument. The requirements of equality of treatment may be refined too far. In *State v. Wirt,* 203 Ind. 121, 177 N. E. 441, 447, a colored girl student in a public school demanded admission to a school attended by white students because that school had a swimming pool attached and hers had none, but this was denied as not required by equal treatment. The court explained: "Swimming is merely one physical activity which may be elected by students in part satisfaction of the requirements of physical training; and, since sufficient physical training is offered in Virginia Street school to satisfy all requirements in that respect, the inability of the relatrix to engage in swim-

ming while a student in Virginia Street school does not represent any actual interference with her educational privileges and opportunities; and especially so since in only two of the nine high school centers in Gary do the pupils have the opportunity to participate in swimming." The distinction in the forms of recreation was regarded as merely an incident to educational facilities, and negligible in consideration of the constitutional requirements. Only on an unreal conception of the case could it have been held that the child was excluded from the swimming pool because of her race and color. One form of gymnastic machine might be provided in one park while a different form is provided in others. There might well be some hesitation at finding that a grass tennis court in one park only would entail an unequal and unconstitutional treatment of players restricted to another park where there are only dirt courts. Again, differences might be found of too little importance to show unequal protection of the laws because of race or color, as, for instance differences in the lighting, or in the stairs to be climbed, in a school building assigned to Negro pupils. *Williams v. Zimmerman,* 172 Md. 563, 568, 192 A. 353. Whether the jury sworn in this case considered any of the differences in the golf courses so negligible, we have no means of determining, and that is one reason why a jury verdict is unsatisfactory as an aid in ascertaining whether there has been a lack of equal protection of the laws; the jury, confined to a narrow issue, cannot make necessary distinctions, and mark out what equal treatment requires. And as application of the constitutional prohibition is largely a matter of its construction in the particular case, a question of law not to be submitted to a jury (*Creager v. Hooper,* 83 Md. 490, 504, 35 A. 159), it is difficult to put any helpful issue at all to that body.

Distinction between golf facilities and the incidental swimming pool in the case cited must be narrow and difficult to state, for it is one of degree, or one of prin-

cipal facility and mere incidental form. It has seemed to this court, however, that if Negro players were excluded altogether from municipal golf courses, there would be a deprivation of equal protection, and the same result must follow from their being relegated to a course which is substantially inferior. The game, we conclude, should not be treated for constitutional purposes as a mere incident of recreational facilities, but a facility in itself from which Negroes cannot be excluded without having other substantially equal provision made for them.

Section 118 of the Baltimore City Charter, 1938, which derives its authority directly from the State Constitution, Article XI, provides that the Board of Park Commissioners, heading the Department of Public Parks and Squares, "shall have charge and control of all public parks belonging to and controlled by or in the custody of the Mayor and City Council of Baltimore." Section 119 gives the Board power "to make such rules and regulations for the government and preservation of order within the parks as it may deem expedient." And these provisions must, we conclude, be construed to vest in the Board the power to assign the golf courses to the use of the one race and the other in an effort to avoid any conflict which might arise from racial antipathies, for that is a common need to be faced in regulation of public facilities in Maryland, and must be implied in any delegation of power to control and regulate. There can be no question that, unreasonable as such antipathies may be, they are prominent sources of conflict, and are always to be reckoned with. Many statutory provisions recognize this need, and the fact needs no illustration. "Separation of the races is normal treatment in this State." *Williams v. Zimmerman,* 172 Md. 563, 567, 192 A. 353, 355. No additional ordinance was required therefore to authorize the Board to apply this normal treatment; the authority would be an implied incident of the power expressly given.

Taking the action authorized by local law, then, and assuming for the purposes of the argument that the appellee has been deprived by it of equal protection of the laws, what is it that he may demand as a remedy. It is not necessary that the inequalities be removed by abandoning segregation, and that he be admitted to all courses along with the white players indiscriminately, but that they be removed in any one of several possible ways in the discretion of the Park Board, that the course assigned to his race be made substantially equal, that he be admitted to one of the other courses, or to all, as the Board may decide. And in attempting to deny the Board any latitude of discretion an error has occurred throughout the proceedings. The petition for the writ prayed "that the respondents and each and every one of them be required and directed to sell greens fee tickets at each and every golf course owned by the Mayor and City Council of Baltimore, and under the charge and control of the respondent Park Board, to your petitioner and to all those who may apply for such greens fee tickets, irrespective of race, creed, or color." And the order for the writ directed that it should issue "as prayer in the petition." The writ accordingly commanded that greens fee tickets be sold at each and every course. And the constitutional provision for equal protection of the laws does not afford that remedy. *Plessy v. Ferguson,* 163 U. S. 537, 41 L. Ed. 256. Not only is segregation within the power and discretion of the Board, it is consistent with the Constitution that some adaptation to special needs and requirements of the Negro players be made. *Berry v. Durham,* 186 N. C. 421, 119 S. E. 748. Nine holes for the small number of players might, for instance, be found upon inquiry to be adequate for them. So far as the Board has discretion, the writ of mandamus cannot be issued to control their action. *Thomas v. Field,* 143 Md. 128, 131, 122 A. 25.

By this pursuit of the wrong remedy for the alleged unequal treatment, therefore, the proceedings were ren-

dered erroneous. A demurrer filed to the petition, which was overruled, should have been sustained, and the order for the writ and the consequent command in the writ, were erroneous, and the order must be reversed, and the case remanded for a new trial.

Prayers offered by the parties for instructions to the jury were all refused by the court, and an oral instruction was given as permitted by Rule III, 6, of the Rules of Practice and Procedure, 1941, and exceptions were reserved by the parties, but in the instruction the court did not place the limitation on the Board's discretion. Defining the ground of complaint as a substantial inequality in accommodations for the Negro players oversimplified somewhat the inquiry for which the jury was sworn, but it seems hardly possible to submit the whole case on the facts to a jury. "What may be regarded as a denial of the equal protection of the laws is a question not always easily determined, as the decisions of this court and of the highest courts of the States will show." *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540, 558, 46 *L. Ed.* 679; *Louisville Gas & Electric Co. v. Coleman,* 277 U. S. 32, 37, 72 *L. Ed.* 770; *Hartford Steam Boiler Inspection & Insurance Co. v. Harrison,* 301 U. S. 459, 461, 81 *L. Ed.* 1223. But it was the appellants who requested the use of a jury, and their verdict, which was, in effect, that there was a substantial inequality of accommodation in Carroll Park for the Negro players if properly entered, cannot be attacked on appeal.

There are other grounds for the appeal which, after a reversal has been found necessary on the one ground, lose some importance, because on a retrial they can be corrected if correction is required. The appellants strongly urge that they were deprived of due process of law in the trial by the judge's hurrying the proceeding to a hearing and crowding the hearing into two days. in order that he might dispose of the case before leaving for his summer vacation as he had planned. And interruptions and interferences by the judge during the hear-

ing are complained of as excessive, and open to the same objection. The judge had planned to leave on June 26 or 27, 1942, and upon the filing of the petition for the writ ordered the respondents to show cause against its issue, without specifying a time for filing an answer as contemplated by Sections 2, 3 and 6 of Article 60 of the Code, and fixed June 25 as the day for the hearing. The respondents protested the hurrying of the pleadings and hearing, urging that the attorneys for the City were occupied with other work, and could not prepare hurriedly for such a new and important controversy; and they had entered into an agreement with attorneys for the petitioner to have the case heard on July 8, before another judge who had consented, but the first judge insisted upon a hearing before himself as ordered. After the overruling of the demurrer to the petition, the respondents were ordered to answer at once or the case would proceed without an answer. An answer was then filed. The case was heard in the afternoon and night of June 26, and from 9 o'clock in the morning until the afternoon of June 27. The jury still deliberating on the latter afternoon, the judge left the court room, after having directed the clerk to take the verdict, and went on his vacation.

This court would not be understood as holding that hurrying a case precipitately, and interfering excessively in the hearing of it, as the appellants complain, could never amount to a deprivation of due process of law, but it thinks that whatever the difficulty, or even hardship, that might be caused, there should be come definite loss of right resulting to justify a reversal in such case. The appellants here did file an answer and present their case. There is nothing to support a finding that any of the facts of principles of law involved were not adequately brought to bear. The court therefore disagrees with the contention made.

A motion was made to strike out the verdict because entered in the absence of the court, and in the refusal of

it there was error. According to the weight of authority elsewhere, and the practice in at least some of the trial courts in this State, verdicts of juries in civil cases are sometimes, by consent of the parties, received and recorded by the clerk in the absence of the judge. Notes: 16 *Ann. Cas.* 90; 10 *Brit. Rul. Cas.* 25. It is an irregularity, for the court is not organized when the judge is absent, but parties consenting can urge no grievance, and in their consent there is a safeguard against injurious resort to the practice. There are several functions which a judge may be called upon to perform when a jury returns to render its verdict, and regularly he should be holding court. Here the judge appears to have assumed that it would be agreeable to the parties to have the verdict so received, but the record does not show any consent to it; it shows ignorance on the part of the City's attorneys of the court's direction to the clerk. Had need for it arisen, it seems the judge could have been reached by telephone for a time while he was absent, and no actual detriment to the appellants by reason of his absence is manifested, but it seems to the court that the practice is one which might have injurious consequences unless safeguarded, and that except by the occasional consent of the parties it is necessary that the trial court be kept organized, and that the judge be ready to receive the verdict. In the case of *Fanshaw v. Knowles,* 1916, 2 K. B. 538, at page 549, 10 *Brit. Rul. Cas.* 25, Scrutton, J., observed: "I cannot help noting, speaking for myself, that in this case and in the last before the court considerable difficulty has arisen from the fact that the learned judge who tried the case has not stayed while the jury were deliberating, so that when they have found themselves in difficulty they have not had the judge to advise them. I think myself it is the duty of the judge to stay to assist the jury so long as the jury are deliberating on their verdict; and the fact that in two cases here we have had appeals which I think would have been prevented if the judge had stayed supports my own personal feeling on the duty of the judge in these matters."

Error is found also in a refusal of the trial judge subsequently to fix the penalty of the appeal bond offered to stay execution of the order. The proceeding is one at law. *Walter v. Board of County Commissioners of Montgomery County,* 179 Md. 665, 668, 22 A. 2d 472; *Watts v. President, Etc., of Port Deposit,* 46 Md. 500, 501. And the filing of an appeal bond in a case at law has always had the effect of staying execution. By Section 12 of Article 60 of the Code it is expressly provided that in case of an appeal by the defendant in a suit for the writ of mandamus, "the court shall fix the penalty of the appeal bond necessary to be given to stay the execution or enforcement of the order appealed from." Provision is also made, says 2 *Poe, Pleading and Practice,* Sec. 713, "for staying the enforcement of the judgment of the court below pending such appeal, in the usual way, by the filing of an appeal bond and affidavit that the appeal is not taken for delay. The penalty of the bond is to be fixed by the court below." And see Code, 1939, Art. 5, Secs. 57 and 58.

Before 1890, there was no power in either a court of law or a court of chancery to prevent such a stay. *Fullerton v. Miller,* 22 Md. 1, 8. But need of a discretionary power in chancery proceedings was felt, and was met by the Act of 1890, Chap. 32, now a part of the Code, 1939, Art. 5, Sec. 33. *County Commissioners v. Board of County School Commissioners,* 77 Md. 283, 293, 26 A. 115. But no such discretion has been vested in judges at law. Their function is limited to passing on the sufficiency of the bond offered. The only provision to prevent harmful delay by the appeals in mandamus cases was that for an early hearing in the Court of Appeals, now in Section 49 of Article 5 of the Code. And the Court of Appeals regularly hears urgent cases as soon as the parties are ready for argument. According to the regular practice, if the appellees stand to lose nothing the loss of which can be repaired by recovery on a bond, the penalty is fixed to cover costs at least.

The first appeal is from the order for the writ of mandamus, and accordingly that order is reversed, and a new trial upon a properly amended petition is awarded. The second appeal is from refusal of the court to fix the penalty of the appeal bond offered in order to stay execution, and while the stay cannot now be granted, and the question has become moot, and reversal without any advantage to the appellants, the entry on that appeal should be reversed. The third appeal is from the writ issued in accordance with the court's order, and is sufficiently covered by the first appeal, and this third appeal is therefore dismissed.

*Orders appealed from in Nos. 54 and 55 reversed with costs, and a new trial awarded; appeal in No. 56 dismissed.*