**LONESOME et al.**

v.

**MAXWELL et al.**

**DAWSON et al.**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE et al.**

**ISAACS et al.**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE et al.**

Civ. Nos. 5965, 5847, 6879.

United States District Court, D. Maryland.

July 27, 1954.

---

Jack Greenberg, New York City, Linwood G. Koger, Jr., Tucker R. Dearing, Baltimore, Md., for plaintiffs.

Edward D. E. Rollins, Atty. Gen., W. Giles Parker, Asst. Atty. Gen., for R. Brooke Maxwell and others.

Thomas N. Biddison, City Sol., Edwin Harlan, Deputy City Sol., Hugo A. Ricciuti, and Francis X. Gallagher, Asst. City Sols., Baltimore, Md., for Mayor and City Council of Baltimore and others.

David P. Gordon and A. Frederick Taylor, Baltimore, Md., for Sun & Sand, Inc.

THOMSEN, District Judge.

The motions for judgments on the pleadings in these three cases raise a single legal question: Does segregation of the races by the State of Maryland and the City of Baltimore at public bathing beaches, bath houses and swimming pools deny plaintiffs any rights protected by the Fourteenth Amendment.

## No. 5965

In this case, filed in August, 1952, plaintiffs, adult and minor Negroes, brought suit against the Commissioners of Forests and Parks of the State of Maryland, and the Superintendent of Sandy Point State Park and Beach, to restrain defendants from operating the bath houses and bathing facilities at Sandy Point State Park on a segregated basis. Plaintiffs alleged that the facilities afforded Negroes were not equal to those afforded whites and that they had been denied admission to the facilities reserved for whites solely because of their race or color. Defendants answered, denying that the facilities were not substantially equal.

On June 4, 1953, following a hearing on plaintiffs' motion for a preliminary injunction, Judge Chesnut entered an order in which he found that the South Beach facilities (for whites) were superior to those at East Beach (for Negroes), and restrained defendants from excluding any person, solely on account of race and color, from the facilities at South Beach. On July 1, 1953, having improved the facilities at East Beach, defendants moved to vacate the preliminary injunction. After a hearing Judge Chesnut entered an order on July 9, 1953 in which he found as a fact that as of the date of said hearing the bathing facilities at East Beach were at least equal to those at South Beach, and vacated and struck out the preliminary injunction theretofore granted, with the right to plaintiffs to renew their motion at any time the facilities at South Beach and East Beach may not be in substantial equality.

## No. 5847

In this case, filed in May, 1952, plaintiffs, adult and minor Negroes, are suing the City of Baltimore, its Board of Recreation and Parks, the Director of the Bureau of Recreation and Parks, and Sun and Sand, Inc., a corporation which operates a concession under the supervision and control of that Board at Fort Smallwood Park, to restrain defendants from operating the bath houses and bathing facilities at Fort Smallwood Park on a segregated basis, alleging that the facilities afforded Negroes are not equal to those afforded whites, and that they were denied admission to the facilities reserved for whites solely because of their race or color. Defendants answered, denying that the facilities are not substantially equal.

## No. 6879

In this case, filed in September, 1953, plaintiffs seek to restrain defendants

from operating on a segregated basis any swimming pool established, operated and maintained by the City of Baltimore. Defendants are the City, its Board of Recreation and Parks, the Director of the Department of Recreation and Parks, and the Superintendent of Parks and Pools. One of the plaintiffs is white; all the rest of the plaintiffs are Negroes. Plaintiffs allege that the bathing facilities which defendants provide for Negroes are not equal to those provided for white persons. Plaintiffs also allege that defendants, by operating the facilities on a segregated basis, deny plaintiffs the right to associate with their friends. Defendants answered that the facilities afforded Negroes are substantially equal to those afforded white persons, and that any denial of use of the bathing facilities which plaintiffs may have experienced was a result of the enforcement of rules and regulations establishing a policy of segregation in the use of bathing facilities in the public parks of Baltimore City.

In all of the cases further proceedings were delayed pending the decision of the Supreme Court in the school segregation cases.

Several days after the filing of the opinion in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, counsel for plaintiffs asked this Court to set these three cases for prompt hearing. Counsel for defendants offered no objection, and the court set the hearings for June 22, 1954. Thereafter, on May 29, 1954, plaintiffs filed a motion for judgment on the pleadings in each of the three cases, asserting in each case: (1.) that the complaint alleges a violation of plaintiffs' constitutional rights in that defendants require racial segregation in the facilities which are the subject of this action; (2.) that the answer admits that defendants exclude plaintiffs from these state-(city-) operated facilities to which they sought admission, solely because of their race; and (3.) that such racial segregation violates the Fourteenth Amendment to the United States Constitution. The respective defendants filed answers to these motions, denying that their actions violate the Fourteenth Amendment.

At a pre-trial conference counsel for all parties in No. 5847 (the Fort Smallwood Bathing Beach case) stipulated "that the separate facilities in question herein are physically equal at this time." A similar stipulation was filed in No. 5965 (the Sandy Point Bathing Beach case). Counsel in No. 6879 (the case involving the city swimming pools) stipulated "that the only question to be argued at this hearing is the broad question of the right of the City to segregate the races in public swimming pools. Any other question raised by the pleadings is reserved for argument at some future time, if necessary."

Sandy Point State Park is operated administratively by the Commission of Forests and Parks of the State of Maryland under the authority of Section 340 et seq., Article 66C, Annotated Code of Maryland, 1951 Ed. The law does not require the Commission to operate a bathing beach in a segregated or nonsegregated manner; nor indeed does it require the Commission to operate any bathing beach at all. The facilities at Sandy Point State Park, aside from the bathing beaches and bath houses, are entirely unsegregated, but the Commission has provided separate bathing beaches and bath houses for whites and Negroes, by rules and regulations adopted by the Commission in the exercise of its administrative powers. It was stated at the hearing, without objection or contradiction, that the bath houses and bathing beaches at Sandy Point are the only segregated facilities under the control of the Commission of Forests and Parks of the State of Maryland.

Section 6, Sub-section 19, Baltimore City Charter grants the Mayor and City Council of Baltimore power to establish, maintain, control and regulate parks, squares and municipal recreational facilities; Section 96 of said Charter gives the Board of Recreation and Parks authority to regulate and control the use of recreational facilities in the public

parks of Baltimore. Neither the Constitution of Maryland, the City Charter, nor any statute or ordinance requires the Board of Recreation and Parks to operate the bathing, swimming and other recreational facilities on a segregated or unsegregated basis. Over the years the Board of Recreation and Parks has made and modified various rules and regulations dealing with segregation in the public parks. At the present time no parks, as such, are segregated, but certain recreational facilities, including the bathing beaches, the swimming pools, some tennis courts and fields for competitive sports, and some playgrounds and social activities are operated on a segregated basis. Effective July 10, 1951, the Board of Recreation and Parks set aside for inter-racial play certain athletic and recreational facilities in a number of parks. Counsel agreed at the hearing that a list of these facilities be made a part of the record, and they are referred to later in this opinion.

The authority of the respective boards to make the regulations which are challenged in these cases is supported by Durkee v. Murphy, 1942, 181 Md. 259, 29 A.2d 253, a case involving the segregation of white and Negro players on municipal golf courses. In that case Chief Judge Bond, after referring to the relevant sections of the Baltimore City Charter of 1938 (not substantially different from those of the present Charter of 1946) which conferred powers upon the Park Board to make rules and regulations, said:

"And these provisions must, we conclude, be construed to vest in the Board the power to assign the golf courses to the use of the one race and the other in an effort to avoid any conflict which might arise from racial antipathies, for that is a common need to be faced in regulation of public facilities in Maryland, and must be implied in any delegation of power to control and regulate. There can be no question that, unreasonable as such antipathies may be, they are prominent sources of conflict, and are always to be reckoned with. Many statutory provisions recognize this need, and the fact needs no illustration. 'Separation of the races is normal treatment in this state.' Williams v. Zimmerman, 172 Md. 563, 567, 192 A. 353, 355. No additional ordinance was required therefore to authorize the Board to apply this normal treatment; the authority would be an implied incident of the power expressly given." 181 Md. at page, 265, 29 A. 2d at page 256.

Plaintiffs question whether the statement "separation of the races is normal treatment in this state" is still true, but do not question the power of the respective boards to make such regulations except as they may be prohibited by the Fourteenth Amendment to the Constitution of the United States.

This court has consistently held, following Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, that segregation of races with respect to recreational facilities afforded by the State for its citizens is within the constitutional exercise of the police power of the State, provided the separate facilities afforded different races are substantially equal. Law v. Mayor & City Council of Baltimore, D.C.Md.1948, 78 F.Supp. 346; Boyer v. Garrett, D.C.Md.1949, 88 F. Supp. 353.

Boyer v. Garrett was appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed this court, 183 F.2d 582, saying:

"The contention of plaintiffs is that, notwithstanding this equality of treatment, the rule providing for segregation is violative of the provisions of the federal Constitution. The District Court dismissed the complaint on the authority of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; and the principal argument made on appeal is that the authority of Plessy v. Ferguson has been so weakened by subsequent decisions that we should no longer consider it as binding. We do not

think, however, that we are at liberty thus to disregard a decision of the Supreme Court which that court has not seen fit to overrule and which it expressly refrained from reexamining, although urged to do so, in the very recent case of Sweatt v. Painter [339 U.S. 629], 70 S.Ct. 848 [94 L. Ed. 1114]. It is for the Supreme Court, not us, to overrule its decisions or to hold them outmoded."

Certiorari was denied by the Supreme Court, 340 U.S. 912, 71 S.Ct. 293, 95 L. Ed. 659.

■ That decision of the Court of Appeals for the Fourth Circuit is binding on this court in this case unless the basis for the decision of the Court of Appeals has been swept away by subsequent decisions of the Supreme Court.

Brown v. Board of Education [347 U. S. 483, 74 S.Ct. 692] certainly reexamined the decision in Plessy v. Ferguson. Did it overrule that decision, or establish any principle which makes it clear that the " 'separate but equal' " doctrine of Plessy v. Ferguson may no longer be applied to authorize the provision by a state of separate but equal recreational facilities? If it did, this court must follow the Supreme Court rather than the Court of Appeals for the Fourth Circuit. On the other hand, if Brown v. Board of Education, aside from its obvious effect in the field of education, merely shows which way the wind is blowing, and foretells the ultimate and perhaps imminent elimination of the "separate but equal" doctrine in recreation, transportation and other fields besides education, this court is still bound by the decision of the Fourth Circuit in Boyer v. Garrett.

It is therefore necessary to analyze the opinion in Brown v. Board of Education and to try to determine, with such additional light as may be thrown on the matter by other decisions of the Supreme Court, whether Brown v. Board of Education was intended to wipe out the " 'separate but equal' " doctrine entirely.

The opinion in Brown v. Board of Education discussed the history of the Fourteenth Amendment with respect to segregated schools; observed that in the first cases in the Supreme Court construing the Fourteenth Amendment the Court interpreted it as proscribing all state imposed discrimination against the Negro race; and noted the appearance of the " 'separate but equal' " doctrine in Plessy v. Ferguson and the subsequent history of that doctrine in the Supreme Court. The Court stated that its decision could not turn on merely tangible factors, but that the Court must look to the effect of segregation itself on public education. The Court noted a number of factors which show that education is perhaps the most important function of state and local governments. Reference will be made to those factors later in this opinion. The Court stated that the question presented was: "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" 347 U.S. 493, 74 S.Ct. 691. Answering that question in the affirmative, the court said:

"To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the

motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to retard the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racially integrated school system.'

"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority. Any language in Plessy v. Ferguson contrary to this finding is rejected.

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment." 347 U. S. at pages 494, 495, 74 S.Ct. at pages 691, 692.

What "language in Plessy v. Ferguson" was the Supreme Court rejecting as contrary to "this finding", i. e. the finding in the Kansas case quoted by the Supreme Court in the foregoing extract from its opinion?

The heart of Plessy v. Ferguson lies in the following paragraph, which was quoted by Judge Chesnut as the basis for his decision in Boyer v. Garrett:

"The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced." 163 U.S. at page 544, 16 S.Ct. at page 1140, 41 L.Ed. 256.

It is clear that Brown v. Board of Education overruled the implied approval of segregation in the field of education contained in the foregoing quotation from Plessy v. Ferguson. It appears also that the Supreme Court now disagrees with the general statement in Plessy v. Ferguson that "Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other". The question of what matters fall within the field of "social equality" has never been clear. Brown v. Board of Education indicates that certain claimed rights which may have been heretofore regarded as social matters should now be considered civil rights entitled to constitutional protection. But has the " 'separate but equal' " doctrine been completely overruled? May it still be applied in the field of transportation? May it still be applied in the field of recreation? Brown v. Board of Education did not expressly overrule all of Plessy v. Ferguson nor say that the " 'separate but equal' " doctrine may not be applied in the fields of transportation or recreation. This court must consider the force and extent of the implications of the decision in Brown v. Board of Education.

Counsel for plaintiffs in the cases at bar have noted that the psychological and sociological authorities cited by the Supreme Court in Brown v. Board of Education deal with all fields of segregation and not alone with segregation in education. It is true that the authorities cited would have supported a broader conclusion than the conclusion stated by the Court. The narrowness of the actual decision may have been due to the policy of the Supreme Court to decide constitutional questions only when necessary to the disposition of the case at hand, and to draw such decisions as narrowly as possible. Sweatt v. Painter, 339 U.S. 629, 631, 70 S.Ct. 848, 94 L.Ed. 1114; Rescue Army v. Municipal Court, 331 U. S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666, and cases cited therein. On the other hand it may be that the decision was worded as it was because the Supreme Court did not intend to rule that the "separate but equal," doctrine can no longer be applied in fields other than education.

Let us see what light is thrown on the matter by decisions of the Supreme Court in cases decided after Brown v. Board of Education. On May 24, 1954, the Supreme Court refused certiorari in a number of cases involving rights of Negroes. Only one of those cases dealt with recreation, namely, Beal v. Holcombe, 5 Cir., 193 F.2d 384. In that case a municipal corporation had excluded Negroes from three golf courses, located in parks set aside for white people. The municipality provided no golf courses for Negroes. The Court of Appeals for the Fifth Circuit held that this action violated the equal protection clause of the Fourteenth Amendment, stating that it was in full accord with the reasons given and the results reached in Law v. Mayor and City Council, D.C.Md.1948, 78 F.Supp. 346, which was based upon the "separate but equal," doctrine.

On the same day the Supreme Court entered an order in three cases in which rights of Negroes had been denied below. The Court said, per curiam: "The petitions for writs of certiorari are granted. The judgments are vacated and the cases are remanded for consideration in the light of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, etc., 74 S.Ct. 686, and conditions that now prevail." State of Florida ex rel. Hawkins v. Board of Control of Florida, Muir v. Louisville Park Theatrical Ass'n and Tureaud v. Board of Supervisors of Louisiana State College, 347 U. S. 971, 74 S.Ct. 783, 784. Two of these cases involved education and are clearly controlled by Brown v. Board of Education. The third case, Muir v. Louisville Park Theatrical Association, involved the equality of the recreational facilities afforded Negroes and white persons by the City of Louisville, and the exclusion of Negroes from an amphitheatre for theatrical productions located in a city park reserved for white people. The trial court found that the failure to provide for Negroes facilities for golf and fishing, which were provided for whites, was a violation of the Fourteenth Amendment. But trial court also held that the city violated no rights of the plaintiff by leasing the amphitheatre to a non-profit organization which excluded Negroes from the performances which it sponsored unless the city denied equal opportunities to Negro organizations to lease the amphitheatre. [Sweeney v. City of Louisville] D.C.W.D.Ky.1951, 102 F. Supp. 525. The appeal involved only the second point, and the Court of Appeals for the Sixth Circuit affirmed the decision of the District Court, [Muir v. Louisville Park Theatrical Ass'n] 202 F. 2d 275. The phrase "conditions that now prevail" in the per curiam order of the Supreme Court in the Muir case probably refers to the fact that the lease involved in that case had expired and therefore the case may have become moot. Counsel in the cases at bar suggested no other significant meaning for the phrase "conditions that now prevail."

What light does Brown v. Board of Education throw on the proper decision of the Muir case? The real question in that case was whether the facility was public or private. If it was a public facility, plaintiffs were clearly entitled

to win on the state of the law before Brown v. Board of Education.

The order of May 24, 1954 in the Muir case had a precedent in Rice v. Arnold, 340 U.S. 848, 71 S.Ct. 77, 95 L.Ed. 621. In that case the City of Miami operated a public golf course, permitting Negroes to play one day a week and whites to play on other days. The Supreme Court of Florida approved this action, Rice v. Arnold, 45 So.2d 195. The Supreme Court of the United States entered the following per curiam decision:

"Rice v. Arnold, Superintendent of Miami Springs Country Club. * * * On petition for writ of certiorari to the Supreme Court of Florida. * * * Per Curiam. The petition for writ of certiorari is granted. The judgment is vacated and the cause is remanded to the Supreme Court of Florida for reconsideration in the light of subsequent decisions of this Court in Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848 [29 L.Ed. 1114], and McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851 [94 L.Ed. 1149]."

On remand, the Supreme Court of Florida said [54 So.2d 116]: "We should announce and adhere to our considered judgment as to the meaning of the Constitution and its application to a particular factual situation so long as it is supported by earlier decisions and is not in conflict with more recent holdings either directly or by necessary inference." It found that the Sweatt and McLaurin cases were not controlling in the field of recreation, but vacated its former judgment and again affirmed the decision of the Circuit Court, 54 So.2d 114, including among the grounds for affirmance this time certain procedural matters, which caused the Supreme Court to refuse certiorari, 342 U.S. 946, 72 S.Ct. 551, 96 L.Ed. 704.

It is clear that the Supreme Court felt in 1950 that its decisions in Sweatt v. Painter and McLaurin v. Oklahoma State Regents, and feels now that its decisions in Brown v. Board of Education and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, throw some light on the proper decision of recreation cases. But the Supreme Court has not held that the " 'separate but equal' " doctrine may no longer be applied in the field of recreation; it has left the matter for the lower courts to determine "in the light of" its recent decisions.

This brings us to a consideration of Bolling v. Sharpe, the other segregation case decided on May 17, 1954. In that case, which involved segregation in the public schools of the District of Columbia, the Court said:

"Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect. As long ago as 1896, this Court declared the principle 'that the constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the general government, or by the states, against any citizen because of his race.' * * *

"Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective. Segregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children of the District of Columbia a burden that constitutes an arbitrary deprivation of their liberty in violation of the Due Process Clause.

"In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." 347 U.S. at pages 499, 500, 74 S.Ct. at pages 694, 695.

Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194, cited in Bolling v. Sharpe, involved the exclu-

sion of persons of Japanese ancestry from a military area. The Court said:

"All legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny. Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can." 323 U.S. at page 216, 65 S.Ct. at page 194.

Plaintiffs in the cases at bar contend that any classification or segregation by a state on the basis of race is prohibited by the Fourteenth Amendment unless (1) it is justified by some proper governmental objective, (2) the regulation in question is a reasonable one to achieve that objective, and (3) the separate facilities are substantially equal, inherently as well as physically, or the field of governmental activity in which the classification or segregation is made is so unimportant that no substantial rights under the Fourteenth Amendment are involved. Let us apply these tests to the regulations involved in these cases.

(1) What are the objectives sought to be attained by the regulations, and are they proper governmental objectives?

The first objective cited by defendants was the one approved by the Court of Appeals of Maryland in Durkee v. Murphy, quoted above, namely: "to avoid any conflict which might arise from racial antipathies," which the court found to be "a common need to be faced in regulation of public facilities in Maryland". 181 Md. at page 265, 29 A.2d at page 256.

Plaintiffs in the case at bar argue that this is not a sufficient objective to justify segregation in any field, and that only an objective as strong as the preservation of the republic in time of war is sufficient. Plaintiffs cite Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L. Ed. 149, in support of this contention. In that case the Court held that a statute which limited the right of a property owner to transfer or convey his property to a person of another race was, as an unreasonable discrimination, a denial of due process of law. The court did not hold that the promotion of the public peace by preventing race conflicts was not a proper governmental objective, but did hold that desirable as such an objective may be, it cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.

In each case the importance of the objective and the extent of the alleged deprivation or damage must be considered. It may well be that only an objective as strong as the preservation of the republic will support such a clear deprivation of liberty as was involved in Korematsu v. United States or such a clear deprivation of property as was involved in Buchanan v. Warley. But it does not follow that the prevention of civil disturbance is not a sufficient objective to support separate but equal bathing and swimming facilities. Buchanan v. Warley was decided in 1917, and thereafter the Supreme Court continued to permit the states to supply or require separate but equal facilities in many different fields.

In Bolling v. Sharpe the Court held that segregation in public education is not reasonably related to any proper governmental objective. The Court did not say what governmental objective was sought to be attained by the regulation involved in that case, nor why the objective was not a proper one, nor why segregation in education was not reasonably related to the objective if it was a proper one. The bare statement in Bolling v. Sharpe throws no light on the question as it is presented in cases involving only bathing and swimming facilities. Certainly neither Brown v. Board of Education nor Bolling v. Sharpe holds, or clearly implies, that the objectives sought to be attained by the State and the City in the cases at bar are not proper governmental objectives. Whether the regulations complained of are reasonably related to those objectives, whether they deny any rights cre-

ated or protected by the Federal Constitution, and whether the separate facilities provided are "inherently" as well as physically equal, will be considered in (2) and (3) below.

The second objective cited by defendants in the cases at bar was "the greatest good of the greatest number", of Negroes as well as of whites. At the present stage of social development in the State of Maryland, most (but not all) Negroes are more relaxed and feel more at home among members of their own race than in a mixed group of Negroes and whites; the same is true of whites. I have never heard this statement denied, and it was not denied by counsel for plaintiffs at the hearing in this case. The fact embodied in the statement is deplored by substantially all intelligent Negroes in Maryland, and by some whites. It is quite possible that the ending of segregation in public education will change this pattern swiftly or slowly. But the fact that at this time most Negroes are more relaxed and feel more at home in their own group means that most Negroes will get more recreation from bathing and swimming with other Negroes than in mixed groups. The provision of facilities which will provide the greatest amount of recreation for most members of each group is not an unreasonable objective, though it cannot be pursued in a manner which deprives Negroes or others of their constitutional rights. Whatever constitutional rights plaintiffs may have are personal and must be enforced. That aspect of the problem will be discussed under (3) below. We are dealing here only with the objectives which the State may properly seek to attain.

Neither the Supreme Court nor the Fourth Circuit has held that the objectives sought to be attained by the regulations in these cases are not proper governmental objectives sufficient to justify the segregation of the races at public beaches, bath houses and swimming pools, provided the regulations are reasonable and the facilities inherently as well as physically equal. Boyer v. Garrett is still the law of this circuit and of this district on the question of the propriety of the first objective discussed above.

(2) Are the regulations reasonable? The degree of racial feeling or prejudice in this State at this time is probably higher with respect to bathing, swimming and dancing than with any other interpersonal relations except direct sexual relations. See Gunnar Myrdal, An American Dilemma, pp. 606, 608 et seq., cited by the Supreme Court in Brown v. Board of Education. The State Board of Forestry and Parks has recognized this fact, because the segregated bath houses and beaches at Sandy Point involved in case No. 5965 are the only segregated facilities under control of that Board. The other facilities at Sandy Point State Park and at other places under the jurisdiction of that Board (none of which have bathing facilities) are completely unsegregated.

The State of Maryland and its citizens have steadily broadened the permissible and customary fields of interracial activities. Counsel for plaintiffs, at the oral argument of these cases, denied that the statement in Durkee v. Murphy that " 'Separation of the races is normal treatment in this state' " is still true. He cited, among others, the following facts: The last Jim Crow transportation law in Maryland was repealed in 1951. The Johns Hopkins University, Loyola College and a number of other private educational institutions admitted Negro students before the decision in Brown v. Board of Education. Less than three weeks after the opinion in that case was published the Board of School Commissioners of Baltimore City voted to abolish all segregation in the Baltimore City Schools effective September, 1954. The University of Maryland recently admitted Negroes to courses where they had previously been denied admission. Many new fields of private and public employment have been opened to Negroes as the result of efforts of the Interracial Commission and other civic groups. The Junior Bar Association is

now interracial. Even though the City had sustained its right to segregate the races on public golf courses and tennis courts, the Department of Recreation and Parks of the City of Baltimore agreed, in July, 1951, to permit interracial play at all times on all municipal golf courses, and set aside one or more tennis courts in four public parks for interracial play. At the same time the Board made available for interracial competition a number of baseball diamonds, soft ball diamonds, football fields, cricket fields and facilities for track and field sports. Interracial participation in the supervised programs at six playgrounds was permitted. The Board has approved additional areas for interracial activities since 1951.

Since the hearing in these cases the Housing Authority of Baltimore City has eliminated segregation at its thirteen low rent housing projects, and the University of Maryland has announced that it will admit Negroes in all of its schools.

In the face of such a record a federal judge should be slow to find the objectives of the State or City improper or the judgment of the defendant boards unreasonable, although he should not hesitate to strike down any discrimination.

The regulations providing for segregation in the Baltimore City swimming pools and at Fort Smallwood and Sandy Point are supported by the decision of the Court of Appeals of Maryland in Durkee v. Murphy. Similar regulations in less sensitive fields have been approved in the past by this Court and by the Fourth Circuit. Law v. Mayor and City Council; Boyer v. Garrett.

In the schools the children are supervised by trained and sympathetic teachers, committed to lead their students to a proper adjustment to the new conditions. The bathing and swimming facilities are for all ages, and are practically unsupervised, except by young life guards.

It is quite possible that the end of segregation in education will weaken racial feeling to the point where it will no longer be appropriate to continue segregation in these facilities; but at this time I cannot say that the regulations are unreasonable.

(3) It has been stipulated in the Sandy Point and Fort Smallwood cases that the facilities in question are physically equal at this time. No such stipulation has been made in the case involving the swimming pools. In that case the allegation of inequality was denied by defendants, and it has been stipulated that the only question to be argued at the recent hearing was the broad question of the right of the City to segregate the races in public swimming pools, and that any other question raised by the pleadings be reserved for argument at some future hearing, if necessary. For the purposes of the decision on the motions for judgment on the pleadings, therefore, all of the facilities will be considered physically equal.

Are they also "inherently" equal, or does the very fact of segregation render them "inherently" unequal? Are the rights involved of sufficient importance to amount to a denial of liberty or of equal protection of the laws within the meaning of the Fourteenth Amendment? These questions must be answered by applying to the facts of these cases appropriate criteria or tests, as the Supreme Court did in Brown v. Board of Education.

In Brown v. Board of Education the Supreme Court emphasized the importance of education in modern American life, and said that it was perhaps the most important function of state and local governments.

Although the field of public recreation is not so important a field as public education, modern urban life has made the provision of various types of public recreational facilities for adults as well as for children an important function of state and local governments. The opportunities for free private recreation in a large city are nowhere near so great as in small towns and rural areas. Public recreation is especially important for persons in the lower economic brackets.

The first factor cited by the Supreme Court in Brown v. Board of Education to illustrate the importance of public education was the compulsory character of the school attendance laws. The opposite is true of recreation, which is by its very nature voluntary. This difference does not mean that recreation is not a sufficiently important field of governmental activity to give rise to rights under the Fourteenth Amendment; but it should be considered in determining whether separate recreational facilities are inherently equal, and will be discussed below.

Let us now examine the factors which caused the Supreme Court to find, in Brown v. Board of Education, [347 U.S. 483, 74 S.Ct. 692], that "Separate educational facilities are inherently unequal", and see whether they apply with equal force in the cases at bar, or at least with sufficient force to require this Court to find that separate bathing and swimming facilities which are physically equal, are nonetheless "inherently" unequal.

In determining that separate school facilities are inherently unequal the Supreme Court in Brown v. Board of Education based its decision primarily on its finding that segregation in grade and high schools causes psychological damage which deprives the Negro children of equal educational opportunities. The Supreme Court said:

"To separate them" (the antecedent of "them" was "children in grade and high schools") "solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. * * *

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to retard the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racially integrated school system.' " 347 U.S. at page 494, 74 S.Ct. at page 691.

Some of these statements might apply to segregation in recreation, although, as noted above, the Supreme Court has refrained from deciding or even clearly indicating the extent of their application in fields other than education. Certainly they apply with greatly diminished force, if at all, in the narrow field of public bathing and swimming facilities. The fact that separate bathing and swimming facilities are provided does not affect the motivation of either children or adults to bathe or swim or play. Segregation in this narrow field has little if any tendency to retard the educational or mental or any other development of Negro children and adults nor to deprive them of any of the benefits they would receive in a racially integrated system of bathing and swimming facilities, except social integration with white people.

The various types of recreational facilities differ among themselves in many ways—with respect to their educational and cultural values, with respect to the amount and kind of supervision supplied, with respect to the age groups they cater to, and with respect to the opportunity they afford for horseplay and the release of normal (or abnormal) animal spirits. We are dealing here only with swimming and bathing, which are less like education than many other types of recreation.

Plaintiffs' brief in the cases at bar quotes Butler, Introduction to Community Recreation, New York, 1949, p. 4, as follows: " * * * it is generally agreed that all recreation activity has certain basic characteristics. One is that the person engages in it because he desires and chooses to do so, without compulsion of any type other than an urge from

within * * *. Another characteristic is that the activity brings immediate and direct satisfaction to the individual". From this quotation plaintiffs' brief draws the conclusion: "By this definition segregation in recreation introduces a matter of compulsion which impairs its very nature." It seems to me that this argument cuts both ways. The natural thing in Maryland at this time—whether at private or public beaches or pools—is for Negroes to desire and choose to swim with Negroes and whites with whites, and for the proprietors of the facilities—whether public or private —to provide separate bathhouses, beaches and pools for the two races. An injunction prohibiting segregation would itself contain an element of compulsion which would reduce the recreational value of the facilities for many Negroes as well as whites. It is true that some Negroes and some whites—including the plaintiffs in these cases—would prefer to swim together. But the Constitution does not require the state to adopt a policy which will afford less recreation for the majority of both Negroes and whites to satisfy the desires of a few Negroes and a few whites, unless they can show that the state is denying them equal treatment or some other constitutional right.

What is involved here is not a weighing of the respective advantages furnished to the two groups. Cf. Corbin v. County School Board of Pulaski County, 4 Cir., 177 F.2d 924, 926; Carter v. School Board of Arlington County, Va., 4 Cir., 182 F.2d 531, 535, and cases cited therein. It is stipulated that the facilities are physically equal, and unless the mere fact of segregation renders them inherently unequal the State and City are according the same or equivalent treatment to persons of different races similarly situated.

Nor do we have here any such denial of recreational or other facilities as was involved in Beal v. Holcombe, Rice v. Arnold, or McCabe v. Atchison, etc. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169, and other transportation cases. The fact that the State and the City have provided bathing and swimming facilities on a segregated basis does not mean that the State and the City have not made the opportunity for such recreation available to all on equal terms.

Finally, plaintiffs make the broad argument that separate facilities are unequal simply because they are separate. They say that any and all segregation required or sanctioned by a state is "contrary to our traditions," is degrading to Negroes, restricts their liberty, and makes the separate facilities inherently unequal.

It may be that at some time in the near or distant future the Supreme Court will seek to destroy the whole pattern of segregation and adopt the position that the States may no longer provide or require segregated facilities in any field. But it has not done so yet. The decisions in Brown v. Board of Education and Bolling v. Sharpe were limited to the field of education. See Holmes v. City of Atlanta, D.C.N.D.Ga., 124 F.Supp. 290.

Although there are statements in both opinions which would have supported broader conclusions, the Supreme Court, in Brown v. Board of Education said "We conclude that in the field of education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." The conclusion in Bolling v. Sharpe was stated as follows [347 U.S. 497, 74 S.Ct. 694]: "Segregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children of the District of Columbia a burden that constitutes an arbitrary deprivation of their liberty in violation of the Due Process Clause." The Court did not find that any and all segregation required or sanctioned by a state arbitrarily deprives Negroes of liberty or that all separate facilities are inherently unequal.

In McLaurin v. Oklahoma State Regents [339 U.S. 637, 70 S.Ct. 854] the Supreme Court struck down "restrictions imposed by the state which prohib-

it the intellectual commingling of students," not social commingling or commingling generally. And the per curiam opinions in the two recreation cases, Rice v. Arnold [340 U.S. 848, 71 S.Ct. 77] and Muir v. Louisville Park Theatrical Association [347 U.S. 971, 74 S.Ct. 783] did not state that separate recreational facilities are unconstitutional, but remanded the cases "for reconsideration in the light of" the decisions involving education.

In the light of all the facts and decisions discussed above, I find that the facilities at Sandy Point and Fort Smallwood are "inherently" as well as physically equal. Whether the swimming pool facilities provided by the City for Negroes are equal to those provided for whites can only be determined after a full consideration of all relevant facts and of the legal points raised in such cases as Draper v. City of St. Louis, D.C. E.D.Mo.1950, 92 F.Supp. 546, and in Hyman, Segregation and the Fourteenth Amendment, 4 Vand.L.R. 555, at 564 (1951).

Plaintiffs' motions for judgments on the pleadings are denied.