UNIVERSITY OF MARYLAND *v.* DONALD G.
MURRAY

[No. 53, October Term, 1935.]

*Decided January 15th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Wm. L. Henderson* and *Charles T. LeViness, 3rd, Assistant Attorneys General,* with whom was *Herbert R. O'Conor, Attorney General,* on the brief, for the appellants.

*Thurgood Marshall* and *Charles H. Houston,* with whom was *William I. Gosnell* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The officers and governing board of the University of Maryland appeal from an order for the issue of the writ of mandamus, commanding them to admit a young negro, the appellee, as a student in the law school of the university. The appellee and petitioner, Murray, graduated as a bachelor of arts from Amherst College in 1934, and met the standards for admission to the law school in all other respects, but was denied admission on the sole ground of his color. He is twenty-two years of age, and is now, and has been during all his life, a resident of Baltimore City, where the law school is situated. He contests his exclusion as unauthorized by the laws of the State, or, so far as it might be considered authorized, then as a denial of equal rights because of his color, contrary to the requirement of the Fourteenth Amendment of the Constitution of the United States. The appellants reply, first, that by reason of its character and organization the law school is not a governmental agency, required by the amendment to give equal rights to students of both races. Or, if it is held that it is a state agency, it is replied that the admission of negro students is not required because the amendment permits segregation of the races for education, and it is the declared policy and the practice of the State to segregate them in schools, and that, although the law school of the university is maintained for white students only, and there is no separate law school maintained for colored students, equal treatment has at the same time been accorded the negroes by statutory provisions for scholarships or aids to enable them to attend law schools outside the state. A further argument in defense is that, if equal treatment has not been provided, the remedy must be found in the opening of a school for negroes, and not in their admission to this particular school attended by the whites.

The University of Maryland Law School was a private institution until the year 1920, when by statute, Acts 1920, ch. 480, it was consolidated with the Maryland State College of Agriculture, then an institution of the state government. *University of Maryland v. Williams,* 9 G. & J. 365; *Appeal Tax Court v. University of Maryland,* 50 Md. 457. The agricultural college, during most of its career since the middle of the last century, had been a private institution, but later in that century, and during the early part of the present one, it was supported entirely from state funds, and the State owned an undivided half of its property, and after 1902 held a mortgage on the other half. A legislative enactment for the foreclosure of the mortgage of the college, "so that it become entirely a State institution," was passed in 1914 (chapter 128), and an Act of 1916 (chapter 372) provided a new corporation, to be known as the Maryland State College of Agriculture, to take the college over. All former property and powers were bestowed on the new corporation, and in accordance with the governmental character of it, the trustees were thenceforth to be appointed by the Governor of the State, by and with the advice and consent of the Senate, powers were given and duties were prescribed by the act for them and their officers, and they were required to make to the General Assembly at each session a report of the condition of the college and the property, and of their receipts and expenditures. The Attorney General of the State was designated as their adviser and attorney. That the corporation thus created is an instrumentality or agency of the State is plain, and we do not understand it to be disputed. "When the corporation is said, at the bar, to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation, and its funds and its franchises, at its own good will and pleasure." *Dartmouth College v. Woodward,* 4 Wheat. 518, 671, 4 L. Ed. 629; *University of Maryland v. Wil-*

*liams*, 9 G. & J. 365, 397; *Finan v. Cumberland*, 154 Md. 563, 564, 141 A. 269.

The consolidating Act of 1920, chapter 480, made the University of Maryland, with its law school, and the College of Agriculture, one corporation, which under the name of the University of Maryland was to be governed by the board of trustees provided for the College of Agriculture by the act of 1916. "The government of the University of Maryland, after said consolidation shall become effective, as hereinafter provided, shall be vested in the Board of Trustees provided for by Section 2 of said Act of 1916, Chapter 372, which Board shall thereafter be known as the Regents of the University of Maryland." Acts 1920, ch. 480. It was further provided, however, that the board might, until they thought it expedient to order otherwise, permit any of the previously existing faculties of the University of Maryland to govern themselves in whole or in part, to appoint teachers, and provide for their compensation, and for the expenses of the department, out of any available funds, including the tuition fees from students.

The consolidation was completed. And from the fact of consolidation with a state agency, under one and the same board of trustees, appointed and controlled by the State, it would seem to follow inevitably that the law school maintained is a state agency, or part of one. The one corporation could not be both a public and a private one. It is argued that the school is "in the nature of a private corporation" because it receives the greater part of its support from the students' tuition fees, and therefore its freedom of selection and accommodation of students is not subject to the restriction by the Fourteenth Amendment. But a distinction between agencies which do and those which do not collect fees from individual users of their facilities would not support a distinction between private and public character. It is common practice for unquestionably public corporations to collect pay. Hospitals, and the various municipal corporations or agencies which make charges for utilities supplied, often

with a margin of profit over expenses, remain none the less public in character. 1 *Farnham, Waters*, sec. 162; *Dinneen v. Rider*, 152 Md. 343, 363, 136 A. 754; *Purnell v. McLane*, 98 Md. 589, 56 A. 830; *Twitchell v. Spokane*, 55 Wash. 86, 104 P. 150; *Wagner v. Rock Island*, 146 Ill. 139, 34 N.E. 545; note with review of decisions, 24 *L.R.A. (N.S.)* 290. There is no escape from the conclusion that the school is now a branch or agency of the state government. The State now provides education in the law for its citizens. And in doing so it comes under the constitutional mandates applicable to the actions of the states. The fact that the school, in its career as a private institution, was maintained for white students exclusively, would have no bearing on a question of compliance at this time. With respect to constitutional mandates it is in the situation of a new institution opened by the State. Compare *State v. Board of Trustees*, 126 Ohio St. 290, 185 N.E. 196; *Foltz v. Hoge*, 54 Cal. 28; *Lewis v. Whittle*, 77 Va. 415.

As a result of the adoption of the Fourteenth Amendment to the United States Constitution, a state is required to extend to its citizens of the two races substantially equal treatment in the facilities it provides from the public funds. "It is justly held by the authorities that 'to single out a certain portion of the people by the arbitrary standard of color, and say that these shall not have rights which are possessed by others, denies them the equal protection of the laws.' * * * Such a course would be manifestly in violation of the fourteenth amendment, because it would deprive a class of persons of a right which the constitution of the state had declared that they should possess." *Clark v. Maryland Institute*, 87 Md. 643, 661, 41 A. 126, 129. Remarks quoted in argument from opinions of courts of other jurisdictions, that the educational policy of a state and its system of education are distinctly state affairs, have ordinarily been answers to demands on behalf of non-residents, and have never been meant to assert for a state freedom from the requirement of equal treatment to children of colored races. "It

is distinctly a state affair. * * * But the denial to children whose parents, as well as themselves, are citizens of the United States and of this state, admittance to the common schools solely because of color or racial differences without having made provision for the education equal in all respects to that afforded persons of any other race or color, is a violation of the provisions of the Fourteenth Amendment of the Constitution of the United States." *Piper v. Big Pine School Dist.,* 193 Cal. 664, 226 P. 926, 928; *Board of Education v. Foster,* 116 Ky. 484, 76 S.W. 354; *Ward v. Flood,* 48 Cal. 36.

The requirement of equal treatment would seem to be clearly enough one of equal treatment in respect to any one facility or opportunity furnished to citizens, rather than of a balance in state bounty to be struck from the expenditures and provisions for each race generally. We take it to be clear, for instance, that a state could not be rendered free to maintain a law school exclusively for whites by maintaining at equal cost a school of technology for colored students. Expenditures of this State for the education of the latter in schools and colleges have been extensive, but, however they may compare with provisions for the whites, they would not justify the exclusion of colored citizens alone from enjoyment of any one facility furnished by the State. The courts, in all the decisions on application of this constitutional requirement, find exclusion from any one privilege condemned. *State v. Duffy,* 7 Nev. 342; *Tape v. Hurley,* 66 Cal. 473, 6 P. 129; *Marion v. Territory,* 1 Okl. 210, 32 P. 116; *State v. Board of Trustees,* 126 Ohio St. 290, 185 N.E. 196; *State v. McCann,* 21 Ohio St. 198; *People v. Gallagher,* 93 N.Y. 438; *Wong Him v. Callahan,* (C.C.) 119 Fed. 381; *Puitt v. Gaston County Commissioners,* 94 N.C. 709; *Bonitz v. Board of Trustees,* 154 N.C. 375, 70 S.E. 735. See notes, reviewing decisions, 32 *Law Notes,* 147, 149, *Ann. Cas.* 1915C, 482.

Equality of treatment does not require that privileges be provided members of the two races in the same place. The State may choose the method by which equality is

maintained. "In the circumstances that the races are separated in the public schools, there is certainly to be found no violation of the constitutional rights of the one race more than of the other, and we see none of either, for each, though separated from the other, is to be educated upon equal terms with that other, and both at the common public expense." *Ward v. Flood,* 48 Cal. 36, 51; *Gong Lum v. Rice,* 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; *State v. McCann,* 21 Ohio St. 198; *People v. Gallagher,* 93 N.Y. 438; *Roberts v. Boston,* 5 Cush. (Mass.) 198.

Separation of the races must nevertheless furnish equal treatment. The constitutional requirement cannot be dispensed with in order to maintain a school or schools for whites exclusively. That requirement comes first. See review of decisions in note 13 *Ann. Cas.* 342. And as no separate law school is provided by this State for colored students, the main question in the case is whether the separation can be maintained, and negroes excluded from the present school, by reason of equality of treatment furnished the latter in scholarships for studying outside the state, where law schools are open to negroes.

In 1933, an Act of Assembly, chapter 234, provided that the Regents of the University of Maryland might set aside part of the state appropriation for the Princess Anne Academy, an institution of junior college standing for negro students, now an eastern branch of the university, to establish partial scholarship at Morgan College in the state, or at institutions outside the state, for negroes qualified to take professional courses not offered them at Princess Anne Academy, but offered for white students in the university. Morgan College has no law school. None of the money necessary was appropriated for distribution under that act. By an Act of 1935, chapter 577, a commission on higher education of negroes was created and directed to administer $10,000 included in the state budget for the years 1935-1936 and 1936-1937, for scholarships of $200 each to negroes, to enable them to attend colleges outside the state, mainly to give the benefit of college, medical, law,

and other professional courses to the colored youth of the state for whom no such facilities are available in the state. The allowance of $200 was to defray tuition fees only. This latter act went into effect on June 1st, 1935, and it appeared from evidence that by June 18th, when this case was tried below, three hundred and eighty negroes had sought blanks for applying for the scholarships, and one hundred and thirteen applications had been filled in and returned. Only sixteen had then sought opportunities for graduate or professional study, only one of them for study of the law. Applications were to be received during twelve more days. That any one of the many individual applicants would receive one of the fifty or more scholarships was obviously far from assured. For a large percentage of them there was no provision. And if the petitioner should have received one there would have been, as he argues, disadvantages attached.

Howard University, in Washington, District of Columbia, provides the law school for negroes nearest to Baltimore. The yearly tuition fee there is $135, as compared with a fee of $203 in the day school of the University of Maryland, and $153 in its night school. But to attend Howard University the petitioner, living in Baltimore, would be under the necessity of paying the expenses of daily travel to and fro, with some expenses while in Washington, or of removing to Washington to live during his law school education, and to pay the incidental expenses of thus living away from home; whereas in Baltimore, living at home, he would have no traveling expenses, and comparatively small living expenses. Going to any law school in the nearest jurisdiction would, then, involve him in considerable expense, even with the aid of one of the scholarships, should he chance to receive one. And as the petitioner points out, he could not there have the advantages of study of the law of this state primarily, and of attendance on state courts, where he intends to practice.

The court is clear that this rather slender chance for

any one applicant at an opportunity to attend an outside law school, at increased expense, falls short of providing for students of the colored race facilities substantially equal to those furnished to the whites in the law school maintained in Baltimore. The number of colored students affected by the discrimination may be comparatively small, but it cannot be said to be negligible in Baltimore City, and moreover the number seems excluded as a factor in the problem. In a case on discrimination required by a state between the races in railroad travel, the Supreme Court of the United States has said: "This argument with respect to volume of traffic seems to us to be without merit. It makes the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one. * * * It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which, under substantially the same circumstances, is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded." *McCabe v. Atchison, T. & S. F. R. Co.*, 235 U. S. 151, 160, 35 S. Ct. 69, 71, 59 L. Ed. 169. Whether with aid in any amount it is sufficient to send the negroes outside the state for like education is a question never passed on by the Supreme Court, and we need not discuss it now.

As has been stated, the method of furnishing the equal facilities required is at the choice of the State, now or at any future time. At present it is maintaining only the one law school, and in the legislative provisions for the scholarships that one school has in effect been declared appropriated to the whites exclusively. The officers and members of the board appear to us to have had a policy declared for them, as they thought. No separate school for colored students has been decided upon and only an inadequate substitute has been provided. Compliance with the Constitution cannot be deferred at the will of

the State. Whatever system it adopts for legal education now must furnish equality of treatment now. "It would, therefore, not be competent to the Legislature, while providing a system of education for the youth of the State, to exclude the petitioner and those of her race from its benefits, merely because of their African descent, and to have so excluded her would have been to deny her the equal protection of the laws within the intent and meaning of the Constitution." *Ward v. Flood,* 48 Cal. 36, 51. And as in Maryland now the equal treatment can be furnished only in the one existing law school, the petitioner, in our opinion, must be admitted there.

We cannot find the remedy to be that of ordering a separate school for negroes. In the case of *Cumming v. Board of Education of Richmond County,* 175 U. S. 528, 20 S. Ct. 197, 201, 44 L. Ed. 262, cited by the appellant, the question was whether a board with authority to establish separate schools, but with a limited fund available, could establish a high school for white children while expending the portion for colored children on primary schools, of which the people of that race were in greater need, suspending the erection of a separate high school for them. The Supreme Court denied the remedy of suppressing the white school meanwhile, and added: "If, in some appropriate proceeding instituted directly for that purpose, the plaintiffs had sought to compel the board of education, out of the funds in its hands or under its control, to establish and maintain a high school for colored children, and if it appeared that the board's refusal to maintain such a school was in fact an abuse of its discretion and in hostility to the colored population because of their race, different questions might have arisen in the state court." But in Maryland no officers or body of officers are authorized to establish a separate law school, there is no legislative declaration of a purpose to establish one, and the courts could not make the decision for the State, and order its officers to establish one. Therefore the erection of a separate school is not here an available alternative remedy. We do not under-

stand that the Supreme Court was expressing any opin-
ion on the problem as it is presented by the petitioner.
See *Gong Lum v. Rice*, 275 U. S. 78, 48 S. Ct. 91, 72 L. Ed.
172.

The case, as we find it, then, is that the State has
undertaken the function of education in the law, but has
omitted students of one race from the only adequate pro-
vision made for it, and omitted them solely because of
their color. If those students are to be offered equal treat-
ment in the performance of the function, they must,
at present, be admitted to the one school provided. And
as the officers and regents are the agents of the State
entrusted with the conduct of that one school, it follows
that they must admit, and that the writ of mandamus
requiring it would be properly directed to them. There
is identity in principals and agents for the application of
the constitutional requirement. *Ex parte Virginia*, 100
U. S. 339, 346, 25 L. Ed. 676.

*Order affirmed.*