MURRAY ET AL. *v.* CURLETT ET AL.

[No. 90, September Term, 1961.]

240

*Decided April 6, 1962.*

The cause was argued first before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ., and reargued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and BARRETT, Associate Judge of the Third Judicial Circuit, specially assigned, JJ.

Argued by *Leonard J. Kerpelman,* for appellants.

Argued by *Harrison L. Winter, City Solicitor,* and *Philip Z. Altfeld, Assistant City Solicitor,* with whom was *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellee.

Reargued by *Leonard J. Kerpelman,* for appellants.

Reargued by *Francis B. Burch, City Solicitor,* and *Philip Z. Altfeld, Assistant City Solicitor,* for appellees.

Brief amicus curiae *pro se* filed by *Russell L. Snodgrass.*

HORNEY, J., delivered the opinion of the Court.

This appeal presents the question of whether the daily opening exercises of the Baltimore City public schools—wherein the Holy Bible is read and the Lord's Prayer is recited—violate the constitutional rights of a student and his mother who claim they are atheists.

The judgment appealed from is one for costs entered by the lower court after it had sustained without leave to amend the demurrer of the appellees (the Board of School Commissioners of Baltimore City and the president and other individual members thereof constituting the "Board") to the petition of the appellants (William J. Murray, III, the "student," and Madalyn E. Murray, the "mother" or "parent") for a writ of mandamus. The writ was sought to compel the Board to "rescind and cancel" a rule (and a recent amendment of it) adopted by the Board in 1905, pursuant to the power and authority conferred on it by the State, concerning the opening exercise program in the public schools. The rule and amendment attacked is designated as § 6 of Article VI of the Rules of the Board, and reads as follows:

> "Section 6—Opening Exercises. Each school, either collectively or in classes, shall be opened by the reading, without comment, of a chapter in the Holy Bible and/or the use of the Lord's Prayer. The Douay version may be used by those pupils who prefer it. Appropriate patriotic exercises should [also] be held as a part of the general opening exercise of the school

242

or class. *Any child shall be excused from participating in the opening exercises or from attending the opening exercises upon written request of his parent or guardian."*

The italicized portion of the rule was added by an amendment on November 17, 1960, in order to comply with an opinion rendered by the Attorney General (C. Ferdinand Sybert, now a member of this Court) at the request of the State Superintendent of Schools following a protest by the appellants to the effect that to require the atheistic student to attend the daily exercises was to compel him to participate in a religious training program that was offensive to him.

The petition, in addition to stating that the fourteen year old boy is a student in a public school and that the parent is a resident and taxpayer, further states that the practice under the rule had been to read from the King James version of the Bible and that the student, until the adoption of the amendment, was "required and compelled" to attend the reading program and to recite the Lord's Prayer, but that when the amendment was made he was excused at the request of his mother from further attendance.

The petitioners, in contending that the mandatory rule contravenes their freedom of religion under the first and fourteenth amendments in that it violates the principle of separation between church and state,[1] claim that the enforcement of the rule "threatens their religious liberty" in one way or another; that the rule "subjects their freedom of conscience to the rule of the majority"; and that the rule, by equating moral and spiritual values with religious values has thereby rendered their beliefs and ideals "sinister, alien and suspect" which tends to promote "doubt and question of their morality, good citizenship and good faith."

---

1. The petitioners also contended that the rule was contrary to the provisions of the Code (1957), Art. 77, § 203, proscribing the selection of textbooks of "a sectarian or partisan character," but, other than stating in their brief that they objected to the conduct of religious teachings, whether sectarian or non-sectarian, in public schools, they did not pursue this contention on appeal.

It is further claimed that the amendment excusing the student from participating in or attending the opening program "in no wise negates or mitigates the violation and infringement of their constitutional rights"; that the exclusion of the student has caused him to lose caste, to be regarded with aversion, and to be subjected to reproach and insult; and that the practice "tends to destroy the equality of the pupils" and place him in a disadvantageous position with respect to other pupils.

In conclusion, the petitioners state that although they have requested a cessation of the practice, the use of the rule has not ceased, but has been continued, and that they are thereby harmed.

The Board demurred to the petition on the ground that it did not state a good cause of action for which relief could be granted by way of mandamus. The lower court sustained the demurrer and dismissed the petition without leave to amend. In its memorandum opinion, the court stated two reasons for the action taken. The ultimate decision was based on the theory that the Board, in requiring that the Holy Bible be read or the Lord's Prayer be recited each school day as a part of the opening exercises, with a proviso that objecting students could be excused, was acting in the exercise of discretionary power that the issuance of a writ of mandamus could not stay. But prior to that, the court had found that the facts alleged in the petition for the writ did not "spell out any violation" of the constitutional rights of the petitioners.

Arguments in this case were heard twice. The initial argument was heard by five of the seven judges of this Court on both questions presented by the appeal: (i) whether mandamus is a proper action in which to test the constitutionality of the school board rule; and (ii) whether the provisions of the regulation under attack violate a constitutional right of the petitioners. The reargument was heard by seven judges, one of whom was substituting for Judge Sybert, and in the order directing reargument, we limited the reargument to the constitutional questions raised by the petition. We were then of the opinion and we now hold that where the performance of a duty prescribed by law depends on whether the statute or

244

regulation is constitutional or invalid, there is no reason why the question may not be determined on a petition for a writ of mandamus under such circumstances as are present in this case. *Welch v. Swasey*, 79 N. E. 745 (Mass. 1907); 38 Corpus Juris, *Mandamus*, § 681 b (1); 16 C.J.S., *Constitutional Law*, § 95. See also *High's Extraordinary Legal Remedies* (3rd ed.), § 332 b, p. 325, where, in citing *State v. District Board*, 76 Wis. 177 (1890), it is said that "[m]andamus will lie against a board intrusted with the management of public schools to compel them to discontinue the reading of the Bible in such schools." Moreover, there are a number of decisions in this state where the courts without challenge as to the propriety thereof have proceeded to determine a constitutional question preliminary to the grant or refusal of a writ of mandamus. See, for example, *University v. Murray*, 169 Md. 478, 182 Atl. 590 (1936); *Williams v. Zimmerman*, 172 Md. 563, 192 Atl. 353 (1937); *Torcaso v. Watkins*, 223 Md. 49, 162 A. 2d 438 (1960), *reversed* (on another ground and decided on merits), 367 U. S. 488 (1961).

The principal question is whether the demurrer was properly sustained. The appellees contend preliminarily that the petitioners have not shown they have standing to challenge the rule and the practice under it in the schools of Baltimore City.

If the petitioners lacked standing to sue, this would require affirmance even though the rule and the practice were unconstitutional. Since we find them to be constitutional, we shall assume the petitioners had standing to sue and proceed to discuss the reasons for our views as to constitutionality.

The essential question thus presented is whether the daily Bible reading and Prayer recitation program, at which attendance is not compulsory, is a violation of the "establishment of religion" and "free exercise" clause of the First Amendment (as applied to the States through the due process clause of the Fourteenth) or of the "equal protection" clause of the Fourteenth Amendment. We think that neither constitutional provision is violated, for, as we see it, neither the First nor the Fourteenth Amendment was intended to stifle all rapport between religion and government.

"We are a religious people whose institutions pre-suppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe."

Thus spoke Justice Douglas (at p. 313) in the majority opinion in *Zorach v. Clauson,* 343 U. S. 306 (1952).

The Supreme Court of the United States has not yet passed on either of the constitutional questions posed by this appeal. Yet, there are several decisions concerning the separation of Church and State which we think point the way and clearly indicate that a public school opening exercise such as this one—where the time and money spent on it is inconsequential —does not violate the religious clauses of the First Amendment or the equal protection clause of the Fourteenth Amendment, as would the teaching of a sectarian religion in a public school on school time and at public expense.

The first of the cases we have in mind is *Everson v. Board of Education,* 330 U. S. 1 (1947), where the Court, though it recognized that the clause against the establishment of religion was intended to erect " 'a wall of separation between church and state,' " held that the reimbursement of parents for the cost of transporting their children to parochial and public schools by bus did not violate the "establishment of religion"

clause of the First Amendment because the purpose of the New Jersey statute was to provide safe transportation in the general public welfare.

In *McCollum v. Board of Education,* 333 U. S. 203 (1948), however, where the Illinois public schools and the machinery for compelling attendance thereat were used by sectarian teachers to give religious instruction in such public schools to those pupils who were required to attend the religious classes at the request of their parents, while the other pupils (who were not attending the religious classes) were compelled to attend secular classes instead of being released, the Court held in no uncertain terms that such practices fell "squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth)."

And four years later in *Zorach v. Clauson, supra,* the Court, though following the *McCollum* case, distinguished it nevertheless by stating that a "released time" program of a type different from that involved in *McCollum* was not unconstitutional. In New York the public schools are permitted to release students during school hours on the request of parents to go to classes off school premises for religious instruction, but those who are not so released stay on in public school classrooms. In holding that the program did not violate the First Amendment through the Fourteenth, the Court, after noting that the program did not involve religious instruction in public schools or the expenditure of public funds, nor the use of coercion to require public school students to go to religious classrooms, went on to point out (at p. 312) that if the First Amendment "in every and all respects" required a separation of Church and State, then:

> "Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths— these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the

supplication with which the Court opens each session: 'God save the United States and this Honorable Court.'"

This then may well be the key to the difficult problem with which we are confronted.

We think there is little doubt that a decision in this case lies somewhere between the decision in *McCollum* and that in *Zorach*. In the *McCollum* case, where the "tax-established and taxsupported public school system [was utilized] to aid religious groups to spread their faith," the released time program was unconstitutional. And, in the *Zorach* case, where the public schools did no more than "accommodate their schedules to a program of outside religious instruction," the program was constitutional. It is to be noted, however, that both programs were conducted during school hours, though one involved the use of state funds and the other was at the expense of the churches. But, here, where the use of school time and the expenditure of public funds is negligible, we think the daily opening exercises of the schools in Baltimore City are in the same category as the opening prayer ceremonies in the Legislature of this State and in the Congress of the United States, in the public meetings and conventions which are opened with prayers or supplications to God, and in the formal call of court sessions by the crier in State and Federal courts. For these reasons, and particularly because the appellant-student in this case was not compelled to participate in or attend the program he claims is offensive to him, we hold that the opening exercises do not violate the religious clauses of the First Amendment.

With regard to the effect of having been excused from attending the opening exercises, we think it is significant that the Supreme Court, in *School District of Abington Township v. Schempp,* 364 U. S. 298 (1960), ordered *per curiam* that the judgment below be vacated and remanded the case to the district court for further proceedings, after it was learned that the Pennsylvania law had been so amended as to provide for the excusing of those students who objected to participating in a school opening ceremony quite similar to that in Balti-

more City. It seems to us that the remand of this case at least indicated that the use of coercion or the lack of it may be the controlling factor in deciding whether or not a constitutional right has been denied. In reaching this conclusion we are not unmindful that the District Court for the Eastern District of Pennsylvania has, upon the remand, reheard the case, and again held (in an opinion by John Biggs, Jr., Circuit Judge, reported in 201 F. Supp. 815 [1962]) that the Pennsylvania statute is not constitutional despite the fact that objecting students could have been excused on the request of their parents, but we do not find the decision on remand persuasive and decline to follow it. Moreover, we think it is clear that the case at bar is not governed by the *McCollum* case on the question of compulsory participation, even though *McCollum* was "followed" in *Zorach* as well as in *Torcaso* on the "separation of church and state" point. In *McCollum,* there was a degree of compulsion, but in this case, as in *Zorach, all* compulsion has been removed so far as attendance of the appellant-student at the opening exercises is concerned.

Furthermore, we are not convinced that *Torcaso v. Watkins* (367 U. S. 488) has any bearing on our problem. True, it is a case involving the separation of church and state, but we think it is clearly distinguishable from the instant case. There, in holding that "neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion,'" the Court went on to say (at p. 495) that the fact "that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." In that case the Court was concerned with the compulsion which required a non-believer to profess a belief in God in order to qualify for public office. The present case, however, as has been pointed out, is completely devoid of any compulsion or coercion to attend the school opening exercises. Nor do we find any sustenance for the appellant-student in the Sunday Blue Law cases, including *McGowan v. Maryland,* 366 U. S. 420 (1961), which was cited at the reargument.

The Bible reading and Prayer recitation programs in the

public schools of other states, at which attendance was not compulsory, have been held to be valid by the appellate courts of such states. In an early case, *Church v. Bullock,* 109 S. W. 115 (Tex. 1908), the Court, in upholding a resolution stipulating that students should be present at, but were not required to participate in, the public school exercises in which the Bible was read and the Lord's Prayer was recited, held that the program did not contravene the constitutional provision against the use of public funds to support sectarian religion. In the case of *People ex rel Vollmar v. Stanley,* 255 Pac. 610 (Colo. 1927), the Court, although stating that children could not be required against the will of their parents to attend the reading of the Bible in public schools, nevertheless held that the Bible reading ceremony could not be prohibited altogether. In a comparatively recent case, *Doremus v. Board of Education,* 75 A. 2d 880 (N. J. 1950), *appeal dismissed* 342 U. S. 429 (1952), the Supreme Court of New Jersey, in observing that the First Amendment did not prohibit the recognition of God, held that the noncompulsory practice of reading the Bible and reciting the Lord's Prayer, in conformity with the applicable statute, did not constitute the establishment of religion or prohibit the free exercise thereof. And the recent case of *Engel v. Vitale,* 10 N. Y. 2d 174, 218 N. Y. S. 2d 659 (1961), presently pending in the Supreme Court of the United States, the Court of Appeals of New York affirmed by a divided court a decision of the Appellate Division (206 N. Y. S. 2d 183) holding that the noncompulsory daily recitation of the "regents prayer"[2] in the public schools was not violative of either the state or federal guarantee of freedom of religion. See also *Donahoe v. Richards,* 38 Me. 379 (1854); *Moore v. Monroe,* 20 N. W. 475 (Iowa 1884); *Pfeiffer v. Board of Education,* 77 N. W. 250 (Mich. 1898); *Billard v. Board of Education,* 76 Pac. 422 (Kan. 1904); *Hackett v. Brooksville Graded School Dist.,* 87 S. W. 792 (Ky. 1905);

---

2. This prayer which is recited following the pledge of allegience to the flag at the beginning of each school day is worded as follows: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."

*Wilkerson v. City of Rome,* 110 S. E. 895 (Ga. 1922); *Kaplan v. Independent School Dist.,* 214 N. W. 18 (Minn. 1927); and *Lewis v. Board of Education,* 285 N. Y. S. 164 (N. Y. Misc.), *modified* 286 N. Y. S. 174 (App. Div.), *rehearing denied* 288 N. Y. S. 751 (App. Div.), *appeal dismissed* 12 N. E. 2d 172 (Ct. of Apls. 1937), for other cases that have sustained the reading of the Bible and the recitation of prayers, including the Lord's Prayer, in public schools. And see the annotation in 45 A.L.R. 2d 742.

We come now to the other constitutional question as to whether the appellant-student has been denied the equal protection of the laws guaranteed to him by the Fourteenth Amendment. He relies on *Brown v. Board of Education,* 347 U. S. 483 (1954), declaring as unconstitutional the segregation of the races in public schools, to support the theory that his self-exile from the opening exercises is having a deleterious effect on his relationship with other students in the school. The short answer to this claim is that the equality of treatment which the Fourteenth Amendment affords cannot and does not provide protection from the embarrassment, the divisiveness or the psychological discontent arising out of nonconformance with the mores of the majority. Cf. Footnote 7 to *Zorach v. Clauson, supra,* at p. 311 of 343 U. S. And see *Engel v. Vitale,* 191 N. Y. S. 2d 453 (Spec. Term 1959). We hold that the opening exercises do not violate the equal protection clause of the Fourteenth Amendment.

Inasmuch as the Supreme Court has not yet spoken with respect to the Bible reading and Prayer recitation ceremonies at school opening exercises, we think we are bound by what we understand is the effect of *McCollum* as it is explained and expanded in *Zorach* until such time as the Court speaks further in this uncertain area. So, having decided that the school opening exercises in Baltimore City are not violative of either the First or Fourteenth Amendments, we hold that the demurrer as to both appellants was properly sustained.

For the several reasons stated herein, the judgment will be affirmed.

*Judgment affirmed; appellants to pay the costs.*

BRUNE, C. J., filed the following dissenting opinion, in which HENDERSON and PRESCOTT, JJ., concurred.

This suit for a writ of mandamus brought by a minor through his mother as next friend and by his mother as such and as a taxpayer seeks to bar from the public schools of the City of Baltimore "the reading, without comment, of a chapter in the Holy Bible and/or the use of the Lord's Prayer." Such reading from the Bible and/or use of the Lord's Prayer are required, either collectively or in classes, as a part of the opening exercises in the public schools of Baltimore under a rule of the Board of School Commissioners of that City adopted in 1905 and amended in November, 1960 by adding this provision: "Any child shall be excused from participating in the opening exercises upon the written request of his parent or guardian." The respondents in the suit are (or were) the members of the Board of School Commissioners of Baltimore City.

The petitioners allege *inter alia*: that the minor petitioner is a student at one of the public schools of Baltimore;[1] that they are both atheists; that prior to the amendment of the above rule in 1960 the infant petitioner was required to attend the exercises prescribed by the rule and that since that amendment he had been excused from attending upon his mother's written request; that the reading of the Bible and/or of the Lord's prayer constitute a sectarian exercise in the public schools of Baltimore and so contravenes the First and Fourteenth Amendments to the Constitution of the United States; that the rule, as practised, places a premium on belief as against non-belief, that it pronounces belief in God as the source of all moral and spiritual values, equating those values with religious values, and renders "sinister, alien and suspect the beliefs and ideals of your Petitioners, promoting doubt and question of their morality, good citizenship and good faith";

1. At the time the suit was filed, this petitioner was a student at one public school, but it was stipulated that at the time of the argument he was a student at another public school of Baltimore, and that his change of school does not render the case moot. Cf. *Doremus v. Board of Education*, 342 U. S. 429, 432-33, where a child's graduation did render the case moot with regard to such child.

and that the amendment to the rule permitting pupils to be excused upon request from the opening exercises neither negates nor mitigates the infringement of their constitutional rights; that the effect of the amendment is "merely an opportunity for exclusion" of the student petitioner from a stated school exercise which a majority of the pupils have been taught to revere, and that the exercise of that opportunity causes him "to lose caste with his fellows, to be regarded with aversion, and to be subjected to reproach and insult; and that such practice tends to destroy the equality of the pupils which the Constitution seeks to establish and protect."

The respondents demurred to the petition and their demurrer was sustained without leave to amend. Since the case comes before this Court on a ruling on demurrer, we must accept as true all well pleaded facts. *Mahoney v. Bd. of Sup'rs of Elections,* 205 Md. 325, 327, 106 A. 2d 927. A difficulty here (as in many other cases) is to draw a sharp line between allegations of fact and conclusions to be drawn therefrom, and the further problem arises as to whether a conclusion should be accepted as alleged, should be tested on the basis of facts of which courts may take judicial notice, or should be determined only on the basis of proof. See, for example, the several views as to an allegation of coercion expressed in the majority opinion of Mr. Justice Douglas and in the dissenting opinions of Mr. Justice Frankfurter and of Mr. Justice Jackson in *Zorach v. Clauson,* 343 U. S. 306, 311-12, 321-22, 323.

The majority and minority agree that mandamus is an appropriate remedy to enforce the rights here asserted. A question has, however, been raised as to the standing of the petitioners to maintain the suit at all. The majority assumes, without deciding, that they have sufficient standing to do so, and those who join in this dissent are of the opinion that they do possess such standing. It may be that under *Doremus v. Board of Education,* 342 U. S. 429, the adult petitioner's interest as a taxpayer would not be sufficient, though this case seems rather closer to *Everson v. Board of Education,* 330 U. S. 1 (a taxpayer's suit distinguished in *Doremus*) because of her allegations with regard to the violation of her convictions by the practice complained of. Cf. *Baker v. Carr,* 369

253

U. S. 186, upholding standing of voters to sue for redress of asserted malapportionment of representation in a state legislature. See also Jaffe, *Standing to Secure Judicial Review: Public Actions,* 74 Harv. L. Rev. 1265, esp. pp. 1298-99 and comment on *Everson* and *Doremus,* pp. 1310-11. In any event, the mother's interest as a parent and her son's own interest appear to be clearly sufficient under *McCollum v. Board of Education,* 333 U. S. 203, and *Zorach v. Clauson,* 343 U. S. 306, 309 (n. 4). Cf. *Board of Education v. Barnette,* 319 U. S. 624. See also *Engel v. Vitale,* 218 N. Y. S. 2d 659, 10 N. Y. 2d 174, in which none of the several opinions in the Court of Appeals of New York found, or even referred to, any want of standing on the part of the taxpayer-parents who brought suit to prevent the recital of the so called Regents' prayer in a New York public school.

The principal contention of the appellants on the merits is that the reading from the Bible (whichever version may be used) and/or the recital of the Lord's Prayer in the public schools constitute violations of the provisions of the First Amendment, made applicable to the States under the Fourteenth Amendment (*Cantwell v. Connecticut,* 310 U. S. 296), which proscribe any "law respecting an establishment of religion, or prohibiting the free exercise thereof." The determination of the case depends upon the meaning and application of the Constitution of the United States.[2] On such questions this Court accepts as binding the decisions of the Supreme Court of the United States, and this is, of course, recognized by the majority of this Court in this case as well as by those of us who dissent. The rule is stated here simply because it greatly narrows the matters pertinent to the decision of this case. It would be merely a fruitless exercise in legal history for us to present one more re-examination of the origins and meaning of the religious freedom provisions of the First Amendment, if, as we think, the decisions of the Supreme Court conclude the question to be decided. In *Everson v.*

---

2. No question is raised under the Constitution of this State. See Article 36 of the Maryland Declaration of Rights. Cf. Article 37 and *Torcaso v. Watkins,* 367 U. S. 488.

*Board of Education, supra,* 330 U. S. at 15-16, Mr. Justice Black, writing for the majority, said in part:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'"

The dissents in that case did not challenge this interpretation of the coverage of the First Amendment as being too broad, but thought it was applied too narrowly to the facts of that case.

In *McCollum v. Board of Education,* 333 U. S. 203, the Supreme Court adhered to *Everson* and held invalid under the First Amendment the Illinois "released time" program for religious education in the public schools of Champaign. Such instruction was given on school property and on school time by representatives of several different faiths. Students who did not wish to take such instruction were excused from attendance, but were required to pursue secular studies in some other part of the school building. Students released from secular studies were required to be present at the religious classes, and reports of their presence or absence were to be made to

their secular teachers. There were present in *McCollum* both the use of tax-supported property for religious purposes and close cooperation between school authorities and the local religious council in promoting religious education. The majority opinion, written by Mr. Justice Black, stated, in part (333 U. S. at 209-10):

> "The operation of the State's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment * * * as we interpreted it in *Everson v. Board of Education,* 330 U. S. 1."

Mr. Justice Frankfurter, who had dissented in *Everson,* filed an opinion in which Mr. Justice Jackson, Mr. Justice Rutledge, and Mr. Justice Burton, who had also dissented in *Everson,* joined, stating the view that the Illinois released time program there involved was invalid under the First Amendment. In it he said (333 U. S. at 213): "We are all agreed that the First and Fourteenth Amendments have a secular reach far more penetrating in the conduct of Government than merely to forbid an 'established church.'" This view was recently reiterated by the Supreme Court in *Torcaso v. Watkins,* 367 U. S. 488, at 493-94, in reversing a judgment of this Court.[3] In *McCollum,* Mr. Justice Jackson filed a separate concurring opinion in which he expressed agreement with the opinion of Mr. Justice Frankfurter and also concurred in the result reached by the Court. He expressed some reservations. First, he questioned whether the facts of the case

---

**3.** The opinion was written by Mr. Justice Black and six of the other members of the Court joined in it. Mr. Justice Frankfurter and Mr. Justice Harlan concurred in the result.

established jurisdiction in the Supreme Court, and second, he thought that the Supreme Court should place some bounds on the demands for interference with local schools which that Court is empowered or willing to entertain. Mr. Justice Reed alone dissented.

In *Doremus v. Board of Education,* 5 N. J. 435, 75 A. 2d 880, *appeal dismissed,* 342 U. S. 429, the New Jersey Supreme Court upheld a statute of that State providing for the reading, without comment, of five verses of the Old Testament at the opening of each public-school day. The Supreme Court of the United States dismissed an appeal from that judgment because of the lack of standing of the appellants to maintain the suit. One appellant was a parent of a child who had graduated, and the case was held moot with respect to that child. The claims of the appellants as taxpayers were held insubstantial and insufficient. Mr. Justice Douglas, with whom Mr. Justice Reed and Mr. Justice Burton agreed, dissented as to the latter holding and thought that the case should have been decided on the merits. The majority opinion intimated doubt as to whether the allegations of the complaint showed injury to the child (who had by then graduated) while she was a student, pointing out that there was "no assertion that she was injured or even offended * * * [by the Bible reading] or that she was compelled to accept, approve or confess any dogma or creed or even to listen when the Scriptures were read" and also that there was a stipulation that any child could be excused, at his or her parents' request, from the Bible reading and that no such request had been made. 342 U. S. at 432. The Supreme Court did not, however, rest its dismissal of the appeal of the parent of this child on any ground other than mootness.

In *Zorach v. Clauson, supra,* the New York "released time" program for religious education for public school students was upheld. Attendance was not compulsory and the religious instruction was not given in school buildings nor was any public expense involved. Students were released on written request of their parents to leave the school premises to receive religious instruction or join in devotional exercises at religious centers, and reports of their attendance were furnished to

school authorities by the religious bodies. Students not released to attend religious instruction or observances were required to remain in their classrooms. In the opinion of the Court in *Zorach,* Mr. Justice Douglas made the often-repeated statement relied upon by the majority of this Court in this case and by this Court in *Torcaso v. Watkins,* 223 Md. 49, 162 A. 2d 438, *reversed,* 367 U. S. 488, that "We are a religious people whose institutions presuppose a Supreme Being." 343 U. S. at 313. The Court held, over vigorous dissents by Mr. Justice Black, Mr. Justice Frankfurter and Mr. Justice Jackson, that there was no violation of the principle of separation of church and state and that under the New York released time plan "the public schools do no more than accommodate their schedules to a program of outside religious instruction." The Court then added: "We follow the *McCollum* case." *Id.* at 315.

Because of the different result in *Zorach* from that in *McCollum,* there was some belief (shared by this Court in *Torcaso*) that *Zorach* marked a retraction from *McCollum.* Since the decision of *Torcaso* by the Supreme Court there can hardly be any basis for such a continued interpretation of *Zorach.* The "wall of separation" between church and state recognized by both the majority and the dissenters in *Everson,* and described as "high and impregnable" in *McCollum* (to which case the Court expressed its adherence in *Zorach*), remains as high and impregnable as ever under *Torcaso.* Cf. *McGowan v. Maryland,* 366 U. S. 420, and companion cases, *Gallagher v. Crown Kosher Super Market,* 366 U. S. 617; *Two Guys from Harrison-Allentown, Inc. v. McGinley,* 366 U. S. 582; and *Braunfeld v. Brown,* 366 U. S. 599.

There seems to be no substantial room for dispute that the reading of passages from the Bible and the recital of the Lord's Prayer are Christian religious exercises.[4] This being so, the inclusion of such a reading or recital in the opening exercises of the public schools seems plainly to favor one religion and to do so against other religions and against non-

---

4. If the exercises were confined to reading from the Old Testament, they would be both Jewish and Christian, but still religious.

believers in any religion. This, I think, is directly contra to the prohibition against any "law respecting an establishment. of religion," contained in the First Amendment, as that provision has been interpreted by the Supreme Court. See the *Everson, McCollum, Torcaso* and *McGowan* cases, all cited above. I find nothing inconsistent with the broad interpretation therein set forth in either *Doremus* or *Zorach*. I have already referred to *Torcaso* as to the penetrating reach of the First Amendment. In *McGowan,* the Chief Justice said in the opinion of the Court (366 U. S. at 441-42) : "But, the First Amendment, in its final form, did not simply bar a congressional enactment *establishing a church;* it forbade all laws *respecting an establishment of religion.* Thus, this Court has given the Amendment a 'broad interpretation * * * in the light of its history and the evils it was designed forever to sup-. press.' " The Court then cited *Everson,* 330 U. S. at 14-15 and cited and briefly discussed *McCollum* as holding the religious instruction program there involved "to be contrary to the 'Establishment' Clause." The religious exercises here prescribed, seem to me no less so. Here we are dealing not merely with released time, but with a prescribed religious exercise conducted by public school officials in public schools of the State, attendance at which schools (with exceptions not here important) is required (Code, (1957), Art. 77, Sec. 231), during school time and in school buildings. Granting that the use of school buildings is not a determinative factor in distinguishing *McCollum* and *Zorach,* I think that, if present, it is a relevant factor in determining whether the State is lending its aid to promoting religion. There is, I think, a marked difference between an accommodation of the public school schedule to religious instruction and the inclusion of religious exercises in public school ceremonies. I think that here the State is lending its aid to religion and that *McCollum* is controlling.

The fact that individual students, or theoretically all students, may be excused from attendance at these exercises does not, in my estimation, save the rule from collision with the "establishment of religion" clause of the First Amendment, even if it could save it from collision with the "free exercise of religion" clause. The coercive or compulsive power of the

State is exercised at least to the extent of requiring pupils to attend school and it requires affirmative action to exempt them from participation in these religious exercises.

This conclusion is in accord with the result reached by a special three-judge District Court in Pennsylvania in *Schempp v. School District of Abington Township*, 201 F. Supp. 815, decided February 1, 1962. The opinion was written by Biggs, C. J., after remand of the case by the Supreme Court (364 U. S. 298) following the amendment of the Pennsylvania statute *pendente lite* so as to provide for pupils to be excused upon the written request of a parent or guardian from attending the reading, without comment, of ten verses from the Bible, such reading still being made compulsory in public schools of that Commonwealth.

I have carefully considered the case of *Engel v. Vitale, supra*, 10 N. Y. 2d 174, 218 N. Y. S. 2d 659, in which five of the Judges of the Court of Appeals of New York concurred in upholding the reading in a public school of that State of the so called "Regents' Prayer". There, as in the instant case and in *Schempp*, there were provisions for students to be excused from the exercises at which the prayer was required to be said. I find the dissenting opinion of Judge Dye, in which Judge Fuld concurred, more persuasive than the majority views. The majority seems to me to do as this Court did in *Torcaso* in placing too much reliance on the result of *Zorach* and the oft-quoted statement that "We are a religious people whose institutions presuppose a Supreme Being." The opinion of Justice Dye interprets the decisions of the Supreme Court substantially as I have endeavored to do in this dissent.

Despite the provisions for excuse from attending these religious exercises, two further questions relating to coercion (apart from what might be called the general coercion already considered in connection with the "establishment of religion" clause) still remain. One is whether or not there is coercion upon the individual student by reason of his incurring suspicions and losing caste with his fellows, as alleged in the petition. The other is whether or not there is compulsion upon the student or his parent requesting that he be excused, or upon both, to profess disbelief in any religion.

As to the first of these questions it seems to me that under our ordinary rules of pleading, the allegations of the petition are not so insubstantial as to be brushed aside as mere conclusions of the pleader, and that they are sufficient on demurrer. The Supreme Court has recognized in *Brown v. Board of Education*, 347 U. S. 483, in applying the Fourteenth Amendment, that psychological effects upon children may be of vital importance. Such factors are alleged here, and as the case now stands they are admitted by the demurrer.

With regard to the second question stated — requiring a profession of disbelief—the situation here seems to be the converse of *Torcaso*. There the Supreme Court struck down the provision of the Constitution of this State requiring as a condition of holding an office of public trust that the person elected or appointed thereto declare his belief in the existence of God. Here, since attendance at these religious exercises is compulsory, unless a written parental excuse is filed, what amounts to a profession of disbelief in the religion to which they pertain is required of the parent and perhaps also of the child, at the peril of the child being subjected to the pressures alleged or of the parent and the child, too, if he is old enough to comprehend and share his parents' views respecting religion, subordinating or abandoning their convictions. Cf. *Talley v. California*, 362 U. S. 60, involving a freedom of speech question. Neither a profession of belief nor of disbelief may be required.

These considerations illustrate the intermeshing of the "establishment of religion" and of the "free exercise" clauses of the First Amendment. Hesitancy to expose a child to the suspicions of his fellows and to losing caste with them, will tend to cause the surrender of his and his parents' religious or nonreligious convictions and will thus tend to put the hand of the State into the scales on the side of a particular religion which is supported by the prescribed exercises. *Torcaso* quoted from *Everson* with regard to the meaning of the establishment clause; it also explicitly held that the provision which was there condemned "invades the appellant's freedom of belief and religion and therefore cannot be enforced against him." Whether *Torcaso* proceeds on one or the other or both of

the religious freedom provisions of the First Amendment, it seems clear under all of the cases, including *Zorach,* that coercion is barred.

*Engel v. Vitale, supra,* cert. granted 368 U. S. 924, was argued on April 3, 1962, and is now awaiting determination by the Supreme Court. I believe that its decision in that case will be determinative of this. Meanwhile, I can only state my understanding of the effect of prior decisions of the Supreme Court and express my own opinion that those decisions call for a decision of this case reaching a result opposite to that reached by a majority of this Court.

Judge Henderson and Judge Prescott have authorized me to say that they join in this dissent.